**Mark JOHNSON et al.**

v.

**Neil SOLOMON, etc., et al.**

**Civ. No. Y–76–1903.**

United States District Court,
D. Maryland.

Aug. 17, 1979.

Charlotte M. Cooksey, Susan K. Gauvey, Albert J. Matricciani, Alan S. Davis, Rich-

ard L. North, Carol E. Smith, Lawrence B. Coshnear, Ethel Zelenske, Baltimore, Md., and the Legal Aid Bureau, Inc., Baltimore, Md., for plaintiffs.

Stephen H. Sachs, Atty. Gen., Baltimore, Md., Judith K. Sykes and Lee H. Ogburn, Asst. Attys. Gen., for defendants Neil Solomon, Stanley Platman, Gary Nyman, Rex Smith and Robert L. Karwacki.

Stephen H. Sachs, Atty. Gen., Joel J. Rabin and John K. Anderson, Asst. Attys. Gen., for defendants Richard A. Batterton and Richard W. Bateman.

JOSEPH H. YOUNG, District Judge.

I. INTRODUCTION

This class action [1] was instituted on behalf of 76 children confined in mental hospitals under the jurisdiction of the Maryland Juvenile Court. In their amended complaint, plaintiffs brought this action pursuant to 42 U.S.C. § 1983 in an effort to obtain rights which they claim are due them under the Fourteenth Amendment of the U.S. Constitution, section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Maryland Juvenile Causes Act, § 3–801 et seq., of the Courts and Judicial Proceedings Article of the Maryland Annotated Code.

The amended complaint names as defendants the following State officials in their official and representative capacities: Neil Solomon, Secretary of Health and Mental Hygiene; Stanley Platman, Assistant Secretary for Mental Hygiene and Addictions; Gary Nyman, Director of Mental Hygiene; Rex Smith, Director of the Juvenile Services Administration ("JSA"); Richard A. Batterton, Secretary of Human Resources; Richard W. Bateman, Director of the Maryland Social Services Administration ("SSA"); and Robert L. Karwacki, an Associate Judge of the Circuit Court of Baltimore City.

Plaintiffs allege that monetary damages are inadequate, and they seek declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 1983. Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343, 2201, and 2202.

In essence, plaintiffs seek relief in connection with four claims relating to various procedures and standards utilized in connection with the involuntary civil commitment of juveniles to mental institutions. First, plaintiffs allege that class members are committed to mental hospitals through constitutionally vague and inadequate standards. They argue that such commitments are unlawful under Md.Ann.Code art. 59, §§ 11 and 12. Second, once confined to these institutions, class members are denied periodic review as to whether continued hospitalization is necessary. Third, plaintiff class members do not always receive representation by legal counsel during all stages of the commitment process. Finally, once committed to mental facilities, plaintiff class members contend that they are denied appropriate medical, psychiatric, and rehabilitative treatment, and that the treatment they do receive is not within the scope of the least restrictive alternatives available.

In their pre-trial brief, plaintiffs have requested the Court to grant the following relief: to declare that the actions and omissions complained of in connection with the civil commitment of juveniles violate the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution, as well as 42 U.S.C. § 1983, the Juvenile Causes Act, Md.Cts. & Jud.Proc.Code Ann. § 3–801 et

---

1. By Order dated April 5, 1978, a class was certified pursuant to Fed.R.Civ.P. 23(a) and (b)(2). The class is comprised of all persons under the age of twenty-one who presently are or will be under the jurisdiction of the Juvenile Court, pursuant to the Juvenile Causes Act, Md.Cts. & Jud.Proc.Code Ann. § 3–801 et seq. or its predecessor Act, Article 26, §§ 70–1 et seq., and committed to state mental hospitals (as defined in Md.Ann.Code Art. 59, § 31) and who are aggrieved by the practices of the defendants set forth in the Complaint. The Court further certified a defendant class, represented by defendant Judge Robert L. Karwacki, consisting of all Maryland state court judges having the authority to commit, or who permit state agencies to commit, minors to state mental hospitals pursuant to the Juvenile Causes Act.

*seq.*, and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; to issue an Order enjoining defendants from discriminating against plaintiff class members by denying them the same residential placements and other community-based health, welfare, and social services as afforded non-handicapped persons; to enjoin defendants from committing plaintiff class members to state mental institutions without appropriate hearing and dispositional procedures which embody constitutionally adequate commitability standards; to issue an Order requiring mandatory hearing procedures for the periodic review of commitment; to enjoin defendants from committing plaintiff class members without appropriate independent evaluations to define their present needs in light of the least restrictive appropriate placement; to enjoin further commitments until defendants present a plan for the creation or provision of sufficient appropriate less restrictive alternatives to hospital confinement; to appoint a Special Master and Expert Panel to assist in formulating and implementing the appropriate Decree; to order retroactive relief as to all rights requested; and, finally, to award plaintiffs and their class court costs and reasonable attorneys fees.

Defendants, on the other hand, maintain that the declaratory and injunctive relief requested by plaintiffs is unwarranted in light of actions already undertaken by the State to remedy the commitment inadequacies complained of by plaintiff class members. They further contend that the Court is precluded by *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), from granting the relief sought as to legal representation. Finally, since defendants characterize plaintiffs' requests as constituting essentially habeas corpus relief challenging the fact or duration of physical confinement rather than the conditions of such confinement,[2] defendants maintain that relief may not be obtained in this action under 42 U.S.C. § 1983.

This case began on December 13, 1976, and after almost two years of discovery, which included extensive deposition testimony, the case went to trial on December 15, 1978 and was concluded on December 28, 1978. The documentation amassed in this case demonstrates the thoroughness with which counsel for both sides prepared for trial. There were, for example, over 230 pages of Admissions of Fact totaling more than 600 individual admissions. Obviously, in a case of this complexity, the findings upon which the Court bases its conclusions cannot be exhaustive. In dealing with each of plaintiffs' four principal claims, the Court will present briefly those salient factual premises upon which its ultimate conclusions and legal remedies are based.

## II. CONSTITUTIONALITY OF COMMITMENT STANDARDS

Plaintiffs argue that the standard for commitment of juveniles by the Juvenile Court to State mental hospitals is unconstitutional in that it is void for vagueness and violative of equal protection under the Fourteenth Amendment. An additional argument advanced is that the State may not legitimately confine mentally ill juveniles without a finding that they are dangerous to themselves or others.

Maryland law provides two statutory bases for the civil commitment of juveniles to mental facilities. Article 59, § 11(g) of the Md.Ann.Code provides the following standard for the voluntary commitment of persons under eighteen years of age:

(g) *Persons under 18 years of age.* —With the exception of those facilities established under Article 59, § 31(a), any facility licensed by or under the jurisdiction of the Department may admit for the purposes of care or treatment, or both, any person under the age of 18 years who has any mental disorder which is susceptible of care or treatment and whose admission to such facility has been requested by at least one parent or his

---

**2.** Plaintiffs have consistently stated that they challenge the commitment process itself and not the particular conditions of their confinement. The latter would be cognizable only

under 42 U.S.C. § 1983. *See, e. g., Preiser v. Rodriquez*, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973).

legal guardian. The person requesting such admission must, as a prerequisite to the admission, be able to understand the nature of the request. The admission request must be formal, written and assented to by an admitting physician at the facility. No person admitted pursuant to this subsection may be retained for more than three days, after the person who requested his admission requests his release, unless his admission status is changed pursuant to § 12 of this subtitle. No person admitted pursuant to this subsection may be retained by a facility for any period in excess of one year unless his admission status has been changed after initial admission or unless at the expiration of each one-year period of inpatient residence a new request is executed by a parent or the legal guardian of the patient. At those facilities established under Article 59, § 31(a), the admission of any person under 18 years of age shall be treated as an involuntary admission and shall be subject to the provisions of § 12 of this article, except that a minor who has attained the age of 16 years may consent to admission for the purpose of diagnosis and consultation pursuant to Article 43, § 135A. Additionally, the admission of a minor by a parent to a child or adolescent unit for the purpose of diagnosis and consultation which is assented to by two physicians may be treated as a voluntary admission for a period not to exceed 20 days.

The standard for involuntary commitment of adults to mental facilities is located in Md.Ann.Code, art. 59, § 12, and requires at a minimum that prior to admission a person must be found affirmatively to possess a mental disorder, requires commitment for the protection of himself or others, needs inpatient medical care or treatment, and is unwilling or unable to be admitted voluntarily.

Civil commitments can also be made pursuant to section 3–820 of the Juvenile Causes Act which allows the Juvenile Court to commit a child to a mental hospital without having made findings such as those re-

quired by art. 59, § 12, *supra*. According to plaintiffs, section 3–820 violates the Fourteenth Amendment's equal protection clause since there is no rational basis justifying the difference between the two commitment standards. Under section 3–820, commitments can be made so long as the JCA's dispositional objectives are satisfied:

> The overriding consideration in making a disposition is a program of treatment, training, and rehabilitation best suited to the physical, mental, and moral welfare of the child consistent with the public interest.

JCA § 3–820(b). Before applying the dispositional provision, however, the Juvenile Court must make a jurisdictional determination that a child is "delinquent, in need of supervision, or in need of assistance." JCA § 3–804. *See also* JCA § 3–802 which outlines the purposes of the Act.

Citing *Papachristou v. City of Jacksonville*, 405 U.S. 156, 165–70, 92 S.Ct. 839, 31 L.Ed. 2d 110 (1970), plaintiffs argue that the JCA commitment standard is unconstitutional and should be invalidated since it lacks appropriate standards restricting the discretion of those officials applying the law. They rely principally on two cases, *Stamus v. Leonhardt*, 414 F.Supp. 439 (S.D. Iowa 1976) ("best interest" standard invalidated), and *Goldy v. Beal*, 429 F.Supp. 640 (M.D.Pa.1976) ("need of care" standard invalidated), where district courts found unconstitutional commitment statutes that were too vague in allowing civil commitments on the basis of subjective, ad hoc determinations.

Since "involuntary civil commitment to a mental hospital, like involuntary confinement of an individual for any reason, is a deprivation of liberty which the State cannot accomplish without due process of law," *O'Connor v. Donaldson*, 422 U.S. 563, 580, 95 S.Ct. 2486, 2496, 45 L.Ed.2d 396 (1975) (Burger, C. J., concurring),[3] the due process issue raised by plaintiffs necessarily implicates the degree of specificity required in making such determinations. As the *Goldy* court explained, the "in need of care" stan-

---

**3.** *See also Specht v. Patterson*, 386 U.S. 605, 608, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967); *Do-* *remus v. Farrell*, 407 F.Supp. 509, 513 (D.Neb. 1975); *Lynch v. Baxley*, 386 F.Supp. 378, 385

dard was impermissibly vague because it lacked the degree of specificity mandated by due process considerations in light of the serious nature of the child's loss of liberty:[4]

Such lack of specificity in a statute that authorizes an interference with the constitutionally protected right of physical liberty places insufficient limits on the discretion of officials who are responsible for its implementation, with the result that there is nothing in the statute to prevent it from being enforced arbitrarily. Such a result amounts to vagueness that violates due process. *See Kendall v. True*, 391 F.Supp. 413, 418 (W.D.Ky.1975), and *Bell v. Wayne County General Hospital*, 384 F.Supp. 1085, 1096 (E.D.Mich. 1974).

429 F.Supp. at 648.

Plaintiffs likewise challenge the JCA commitment provisions on equal protection grounds, claiming that there is no possible rational basis for the different standards employed in JCA § 3–820 and art. 59, § 12. In *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), the Supreme Court wrote that:

A classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Royster Guano Company v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920).

404 U.S. at 76, 92 S.Ct. at 254.

To bolster their contention that similar standards should apply for commitment of both adults and juveniles, plaintiffs point to the recommendations offered by the Final

---

(M.D.Ala.1974); *Bell v. Wayne County General Hospital at Eloise*, 384 F.Supp. 1085, 1092 (E.D. Mich.1974).

4. In discussing the standard of proof required before a person could be involuntarily committed to a mental hospital, the court in *Stamus, supra*, rejected the "preponderance" standard in favor of proof of a "clear and convincing" nature "[b]ecause the cost to the individual of her loss of liberty in the commitment proceeding is so great." 414 F.Supp. at 449.

Because the nature of the right at stake is so great and the deprivation of liberty with all of its attendant stigmatization may be permanently devastating, a higher standard of proof is required in juvenile delinquency proceedings, *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), and in civil commitment proceedings where "the legal and social consequences of commitment constitute a stigma of mental illness which can be as debilitating as that of a criminal conviction." *Stamus, supra*, 414 F.Supp. at 449. *See also In re Ballay*, 157 U.S.App.D.C. 59, 482 F.2d 648, 668–69 (1973).

In *Lynch v. Baxley*, 386 F.Supp. 378, 393 (M.D.Ala.1974), the court also required a higher standard of proof, reasoning as follows:

Because the stigmatization and loss of liberty attendant upon forced confinement are of the most profound consequence to the individual affected, due process demands that he be subjected to such disabilities only if the necessity for his commitment is proved by evidence having the highest degree of certitude reasonably attainable in view of the nature of the matter at issue. In a civil commitment proceeding, the questions involved are the primarily subjective ones of the subject's mental condition and the likelihood that he will be dangerous in the future. Such subjective determination cannot ordinarily be made with the same degree of certainty that might be achieved where purely objective facts and occurrences are at issue. Consequently, the trier of fact must be persuaded by clear, unequivocal, and convincing evidence that the subject of the hearing is in need of confinement under the minimum standards for commitment herein enumerated.

Obviously, before such higher standards of proof can be applied, more exacting criteria must be articulated and applied at the initial commitment proceeding.

This higher standard of proof was recently adopted by the Supreme Court in *Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), where it rejected the "preponderance of the evidence" standard of proof in civil commitment proceedings in favor of a "clear and convincing" standard which the Fourteenth Amendment requires for indefinite involuntary civil commitments to state mental hospitals. Chief Justice Burger wrote that:

Loss of liberty calls for a showing that the individual suffers from something more serious than is demonstrated by idiosyncratic behavior. Increasing the burden of proof is one way to impress the factfinder with the importance of the decision and thereby perhaps reduce the chances that inappropriate commitments will be ordered.

441 U.S. at 427, 99 S.Ct. at 1810.

Report of the Maryland Commission on Juvenile Justice (hereinafter referred to as the "Karwacki Report"), Plaintiffs' Exhibit No. 6, which proposed that certain redefinitions in the direction of greater specificity be made as to commitment and treatment criteria. For example, with reference to proposed legislation affecting children in need of support ("CINS") and children in need of assistance ("CINA"), the Karwacki Report made the following proposal:

> The broad-scoped, ill defined "best interests of the child" formula is abandoned as the criteria for court intervention, and, substituted in its stead, is a more particularized inquiry as to whether it is necessary for the Court to protect the child from a specific harm. Thus the general law is replaced by more explicit terms enabling a more even-handed application of the law in all jurisdictions of Maryland. The Commission is convinced that intervening in the life of a child and his family should only occur when benefits to them are likely to be realized.

Karwacki Report at 27. In its proposed legislation which would render commitment standards more precise, the Karwacki Commission recommended the following standard:

> (c) A child in need of assistance may be placed in an institution for the mentally ill or mentally retarded if:
>
> (1) The child is mentally ill or retarded;
>
> (2) The child is in need of institutional in-patient treatment; and
>
> (3) The child presents a danger to his own life or safety of others.

Karwacki Report, Appendix C.4, at 14.

Since the equal protection clause has been held applicable to involuntary civil commitment proceedings, *Dorsey v. Solomon*, 435 F.Supp. 725 (D.Md.1977), plaintiffs submit that specific findings reflecting the need for commitment should be made prior to a Juvenile Court's ordering such commitment as is now done with adults.[5] Plaintiffs contend that while not all Juvenile Court judges apply the JCA dispositional provision, section 3–820, it is undisputed that the judges do not apply the art. 59, § 12 involuntary commitment standards which require specific findings prior to ordering commitment. *See* Defendants Solomon, et al. Answer to Complaint ¶ 24. The "best interests of the child" standard, they claim, is so vague as to permit an "unwritten standard provid[ing] no basis for review." Plaintiffs' Pre-trial Brief at 5 n. 1.

In their final challenge to the JCA's commitment standards, plaintiffs suggest that due process considerations require that a state may not deprive someone of his liberty on grounds of his being mentally ill unless that person presents a serious danger to himself or to others. *Suzuki v. Quisenberry*, 411 F.Supp. 1113 (D.Hawaii 1976).[6] The JCA dispositional standard requires no such finding of dangerousness. Since involuntary commitment entails a "massive curtailment of liberty," *Humphrey v. Cady*, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972), plaintiffs argue that their liberty interests prevent them from being institutionalized without due process of law. This requirement is even more important in cases where juveniles are committed pursuant to the State's *parens patriae* powers:

> It matters not whether the proceedings are labeled "civil" or "criminal" or whether the subject matter be mental instability or juvenile delinquency. It is the likelihood of involuntary incarceration— whether for punishment as an adult for a

---

5. *See also, Jackson v. Indiana*, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972); *Baxstrom v. Herold*, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966).

6. *See also, Stamus v. Leonhardt*, 414 F.Supp. 439 (S.D.Iowa 1976); *Kendall v. True*, 391 F.Supp. 413 (W.D.Ky.1975); *Doremus v. Farrell*, 407 F.Supp. 509 (D.Neb.1975); *Lynch v. Baxley*, 386 F.Supp. 378 (M.D.Ala.1974); *Bell v. Wayne County General Hospital at Eloise*, 384 F.Supp. 1085 (E.D.Mich.1974); *Lessard v. Schmidt*, 349 F.Supp. 1078, 1089 (E.D.Wis. 1972), *vac. and remanded on other grounds*, 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974), *order of judgment entered*, 379 F.Supp. 1376 (E.D.Wis.1974), *remanded*, 421 U.S. 957, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975), *judgment reinstated*, 413 F.Supp. 1318 (E.D.Wis.1976); *Dixon v. Attorney General*, 325 F.Supp. 966 (M.D.Pa.1971).

crime, rehabilitation as a juvenile for delinquency, or treatment and training as a feeble-minded or mental incompetent—which commands observance of the constitutional safeguards of due process. Where, as in both proceedings for juveniles and mentally deficient persons, the state undertakes to act in parens patriae, it has the inescapable duty to vouchsafe due process, and this necessarily includes the duty to see that a subject of an involuntary commitment proceedings [sic] is afforded the opportunity to the guiding hand of legal counsel at every step of the proceedings, unless effectively waived by one authorized to act in his behalf.

*Heryford v. Parker,* 396 F.2d 393, 396 (10th Cir. 1968). Dangerousness to others results in commitment under the State's police powers, whereas dangerousness to oneself provides the rationale for commitment by the State's *parens patriae* powers.

The view that a state's exercise of its *parens patriae* power in the context of civil commitment of juveniles must bear some relationship to actual need or realistic goals is but a modern recognition of a long-recognized maxim that "[t]he restraint can continue [only] as long as the necessity continues." *Matter of Oakes,* 8 L.Rep. 123 (Sup. Jud.Ct.Mass.1945). More recently, the Supreme Court affirmed this view when it concluded: "At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Jackson v. Indiana,* 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972). *See also Bell v. Wayne County General Hospital at Eloise,* 384 F.Supp. 1085, 1096 (E.D.Mich.1974). Plaintiffs' challenge to the JCA commitment standards really represents a logical argument beginning

with the need to make a specific finding of dangerousness. Since the *parens patriae* rationale requires that dangerousness be present,[7] plaintiffs, in effect, argue that such a determination must be made initially before the commitment can be justified. Also, in order to make this determination, the authorities need more precise guidelines than those currently embodied in the JCA commitment standards. Without articulation and application of appropriate standards, subsequent commitments under the *parens patriae* doctrine lack the necessary "reasonable relation" between commitment and purpose. *Jackson v. Indiana, supra,* 406 U.S. at 738, 92 S.Ct. 1845.

As the court in *French v. Blackburn,* 428 F.Supp. 1351, 1360 (M.D.N.C.1977), recognized, "the involuntary commitment proceedings do not have as their sole purpose the deprivation of liberty, but also have as a significant and valid goal the treatment and aid of a person alleged to be mentally ill or inebriate and who is imminently dangerous to himself or others." Unless the state commitment standards embody an approach more specific than the "best interests of the child," there is no guarantee that involuntary commitment will bear any rational relationship to the underlying *parens patriae* principle justifying the juvenile's loss of liberty.

The State, of course, submits that the JCA standards are not vague or otherwise violative of constitutional due process and equal protection guarantees. In their post-trial Memorandum, defendants Solomon, et al. suggest that:

> [t]he State has a legitimate interest in deciding that children who have been adjudicated to be in need of supervision, in need of assistance, or delinquent, but who

---

7. *See, e. g., Suzuki v. Quisenberry,* 411 F.Supp. 1113 (D.Hawaii 1976); *Stamus v. Leonhardt,* 414 F.Supp. 439 (S.D.Iowa 1976); *Kendall v. True,* 391 F.Supp. 413 (W.D.Ky.1975); *Doremus v. Farrell,* 407 F.Supp. 509 (D.Neb.1975); *Lynch v. Baxley,* 384 F.Supp. 1085 (E.D.Mich. 1974); *Lessard v. Schmidt,* 349 F.Supp. 1078 (E.D.Wis.1972); *vacated and remanded on other grounds,* 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974), *order of judgment entered,* 379 F.Supp. 1376 (E.D.Wis.1974), *remanded,* 421 U.S. 957, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975), *judgment reinstated,* 413 F.Supp. 1318 (E.D.Wis.1976); *Dixon v. Attorney General,* 325 F.Supp. 966 (M.D.Pa.1971). *See also Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975).

are not dangerous to themselves or others, can benefit from the treatment provided in a mental hospital . . . . . Since parents are limited by Article 59, Section 11 with respect to the placements they can make, the juvenile court may be the only avenue for placement of certain children who, while not "dangerous," could benefit from treatment provided in a mental hospital. The "legitimate state interest" standard of *[Planned Parenthood of Missouri v.] Danforth,* [428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976)] is satisfied.

Post-Trial Memorandum of Defendants Solomon, et al. at 18–19.

The problem with this argument, however, is that in the specific context of involuntary commitment to a mental hospital where the deprivation of liberty is great and the possibility of stigmatization is very real,[8] the mere *possibility* of benefit is not enough to justify such official paternalism:

. . . [T]he mere presence of mental illness does not disqualify a person from preferring his home to the comforts of an institution.

\* \* \* \* \* \*

In short, a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends.

*O'Connor v. Donaldson,* 422 U.S. 563, 575–76, 95 S.Ct. 2486, 2493–94, 45 L.Ed.2d 396 (1975). In *Lessard v. Schmidt,* 349 F.Supp. 1078, 1093 (E.D.Wis.1972), the court reiterated the fact that the restrictions placed upon liberty in such cases must depend on there being sufficient capacity to harm. As was properly explained in *Suzuki v. Quisenberry,* 411 F.Supp. 1113, 1124 (D.Hawaii 1976), *citing Lynch v. Baxley,* 386 F.Supp. 378, 389–92 (M.D.Ala.1974),

A finding of dangerousness indicates the likelihood that the person to be committed will inflict serious harm on himself or on others. In the case of dangerousness to others, this threat of harm comprehends the positive infliction of injury—ordinarily physical injury, but possibly emotional injury as well. In the case of dangerousness to self, both the threat of physical injury and discernible physical neglect may warrant a finding of dangerousness. Although he does not threaten actual violence to himself, a person may be properly committable under the dangerousness standard if it can be shown that he is mentally ill, that his mental illness manifests itself in neglect or refusal to care for himself, that such neglect or refusal poses a real and present threat of substantial harm to his well-being, and that he is incompetent to determine for himself whether treatment for his mental illness would be desirable.

*See also Bell v. Wayne County General Hospital at Eloise,* 384 F.Supp. 1085 (E.D. Mich.1974).

At trial, plaintiffs presented testimony from several experts who concluded that the present JCA commitment standards were too vague and resulted in numerous inappropriate placements in mental institutions.[9] Plaintiffs also point to the fact that

---

8. The trial testimony of Dr. Milton Senn, a retired professor of pediatrics at Yale and a physician at the New Haven Medical Center, indicated that even one day's confinement to a mental institution if unwarranted could have traumatic side effects. This Court had occasion to make a similar finding recently in *Gross v. Pomerleau,* 465 F.Supp. 1167, 1173 (D.Md. 1979).

9. See the trial testimony of Drs. Milton Senn, Marvin Schwarz, and James Gordon who concluded that several plaintiff class members had been inappropriately placed. After his visit to Spring Grove Hospital in December, 1977, Dr.

Senn's evaluation was that of the patients he saw and records he reviewed, approximately one-half were inappropriately placed. Moreover, he stated that staff members themselves had commented to him that they believed some patients were inappropriately placed. Dr. Schwarz added that in his opinion, independent treatment programs were unrelated to mainstreaming or returning juveniles to their communities, and this factor tended to prolong hospitalization unnecessarily. Dr. Gordon, after reviewing the charts of four class members in detail and summaries relating to some 70 others, explained that in his opinion, viable alternatives to hospitalization had not been ade-

defendants have even admitted the fact that some juveniles are inappropriately admitted to mental hospitals. According to Dr. Stanley Platman, Assistant Secretary for Mental Health and Addictions, inappropriate placements by the Juvenile Court result in some cases because the mental hospitals lack the control over these admissions which they exercise over civil commitments under article 59. This lack of control may be attributed, no doubt, to the lack of specific standards in the JCA.

Of particular interest is the Department of Health and Mental Hygiene's admission itself that inappropriate placements occur because of ignorance or insensitivity, both of which may be encouraged by inadequately articulated commitment standards:

a child who could be treated in a community mental health center should not be placed in an institutional setting for treatment. Too often because of lack of parental ability, lack of juvenile court appreciation of mental health programs and lack of foster care placement facilities, children who do not need to be institutionalized in hospitals find their way into our regional hospital centers. Inappropriate placements are costly to the individual, the mental health system and society.

State of Maryland, Department of Health and Mental Hygiene, Plan for Fiscal Years 1979–1983 at V–561 (Plaintiffs' Exhibit No. 7). While issues relating to appropriateness of placement may further implicate the range of placement alternatives available and the claim that the least restrictive alternative should always be employed,[10] the first hurdle is the placement decision itself which must be based upon standards subject to meaningful subsequent review, both as to the initial determination as well as to continued commitment and treatment.

■ Consequently, the Court holds that the present JCA commitment standards are unconstitutional for the reasons expressed above and directs that standards be adopted which satisfy constitutional prerequisites.

### III. MANDATORY PERIODIC REVIEW

The next challenge plaintiffs bring against Maryland's juvenile commitment procedure is a due process and equal protection challenge to the absence of any mandatory periodic review provisions in the JCA or the State's Mental Hygiene Law. JCA section 3–826 states that "[i]f a child is committed to an individual or to a public or private agency or institution, the court *may* require the custodian to file periodic written progress reports, with recommendations for further supervision, treatment, or rehabilitation." (Emphasis added.) Although providing for some progress reports, this section does not mandate periodic review since a court "may" but need not require filing of such written reports.

Basing their claims upon due process grounds, plaintiffs rely on *Jackson v. Indiana,* 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972), where the Supreme Court held that "[a]t the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *See also McNeil v. Director, Patuxent Institution,* 407 U.S. 245, 250, 92 S.Ct. 2083, 32 L.Ed.2d 719 (1972). Similarly, the Court has concluded that even if an involuntary commitment was initially permissible on *parens patriae* grounds, "it could not constitutionally continue after that basis no longer existed." *O'Connor v. Donaldson,* 422 U.S. 563, 575, 95 S.Ct. 2486, 2493, 45 L.Ed.2d 396 (1975).

Plaintiffs want a "mandatory" periodic review, meaning a review that is automatically initiated by the Court at the appropriate time period rather than having to wait for the committed person, his guardian, or relative to initiate such review. Plaintiffs contend that "patient-initiated review" such

quately explored, hospital stays were too long, and they tended to promote regression. Furthermore, he specifically criticized the failure to provide early and expeditious discharge procedures.

**10.** See Part V, *infra.*

as habeas corpus would be ineffective given the possibility that mental patients will be unable in many instances to utilize this avenue successfully:

> The failure of patients to request a hearing may be attributable to their incompetence, their lack of knowledge of the relevant procedures, the effort necessary to utilize the procedures, the cost of pursuing review, the disorienting effects of drugs or other treatments, or institutional pressures to rely on staff judgments rather than to invoke legal remedies. Thus the requirements of periodic recommitment cannot be satisfied by the mere existence of patient-initiated review procedures.

Note, *Developments in the Law—Civil Commitment of the Mentally Ill*, 87 Harv.L. Rev. 1190, 1398 (1974). Furthermore, mandatory periodic review would not only extend to the fact of commitment but would also present an occasion to review whether treatment should be continued, albeit in a less restrictive alternative.[11]

As plaintiffs amply demonstrate, not only has the Karwacki Commission endorsed mandatory periodic review but several national organizations have done so as well. The Proposed Standards for Juvenile Justice prepared by the Juvenile Justice Standards Project of the Institute of Judicial Administration and the American Bar Association would require such review of the status of all children under court supervision "at least once every six months following the initial dispositional hearing."[12]

Defendants respond that such review is not constitutionally required since the provisions of Rule 916 of the Maryland Rules of Procedure which allows for modification or vacation of an order by any party, person, institution, or agency is all that is needed to prevent overlong or unnecessary commitments. The evidence presented at trial, however, demonstrates that reliance on Rule 916 alone will not guarantee that children remain committed only so long as is medically necessary. Mandatory periodic review does rest upon a constitutional foundation because the deprivation of liberty attendant upon a commitment can only be justified as long as that commitment is actually necessary. Without some formal, automatic review procedure, the risk is too great that children will be institutionalized far longer than required or actually become lost in a slow-moving, self-perpetuating bureaucracy. Regular review will serve as a failsafe check to make certain that no one remains committed longer than necessary and that no one remains committed to a more restrictive treatment program when a less restrictive alternative would be more therapeutic.

Plaintiffs amply demonstrated that overlong hospitalization resulted from the lack of periodic review. One of defendants' experts, Dr. Alp Karahasan, testified that juveniles committed pursuant to the JCA remained hospitalized far longer than children committed pursuant to Article 59 standards. The Admissions of Fact revealed that fifteen class members committed for at least six months had no progress reports submitted to the Juvenile Court and received no placement review hearing during their hospitalization.[13] These class members were hospitalized from periods ranging

---

11. The Karwacki Report also endorses such mandatory periodic review in proposed legislation requiring "that the individual or agency to whom the child is committed file six month progress reports with the court." Plaintiffs' Exhibit No. 6, at 26.

In challenging the absence of such review on equal protection grounds, plaintiffs point to Regulation 10.21.01.03(G) of the Department of Health and Mental Hygiene which provides administrative hearings for minors who have been civilly committed.

12. Plaintiffs' Exhibit No. 116, at 135–36. *See also* Proposed Federal Standards for Child Abuse and Neglect in Residential Institutions. Plaintiffs' Exhibit No. 97, and Standard 14.30, Postdispositional Monitoring of Endangered Children—Periodic Review Hearings, in Juvenile Justice and Delinquency Prevention, National Advisory Committee on Criminal Justice, Standards and Goals 1976 at 496 (recommending review at least every six months). Plaintiffs' Exhibit No. 115.

13. Admission No. 271, Plaintiffs' Exhibit No. 117.

from six to twenty-two months.[14] Twenty-three class members had progress reports submitted to the Juvenile Court but received no placement review hearing.[15] Ten of the twenty-three in this group did not have progress reports submitted every six months.[16] In sixteen out of the twenty-three cases where reports were submitted to the Juvenile Court by hospital personnel, recommendations of discharge and/or a more appropriate alternative placement were made.[17] Finally, only seventeen class members ever received placement review hearings by the Juvenile Court, and such hearings were not held every six months for the five class members who had been hospitalized for one year or longer.[18]

■ This record is a spotty one at best and indicates the need for a more systematic periodic review. There has been no showing that the expense of such review in terms of time or money will be great; however, overlong hospitalization. has been shown to be antitherapeutic and likely to create institutionally dependent children. One class member, William B., entered Spring Grove Hospital Center on June 29, 1976 and was recommended for release on September 29, 1976 by his treating psychiatrist in a letter to the Department of Social Services. Four similar letters were also written making the same recommendation; however, there is no evidence that the Juvenile Court received this information. William B. was finally discharged on December 21, 1977. Since commitments must now be made in terms of constitutionally adequate standards,[19] mandatory periodic review is a necessary complement to this overall approach. Mandatory periodic review will ensure that a redetermination as to both suitability of commitment and the nature of that commitment will be based upon the standards employed during the original commitment hearing.

The Supreme Court has recently noted the importance of periodic review in *Parham v. J. L.,* 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979), where Chief Justice Burger commented, "[w]e assume that a child has a protectible interest not only in being free of unnecessary bodily restraints but also in not being labeled erroneously by some because of an improper decision by the state hospital superintendent." 442 U.S. at ——, 99 S.Ct. at 2504. The Court expressly affirmed the "child's continuing need" for periodic commitment review as a means of guarding against possible arbitrariness in the *initial* admission decision, 442 U.S. at 607 n. 15, 99 S.Ct. 2493, which raises the next logical question of who should conduct such review.

## IV. THE RIGHT TO MANDATORY APPOINTED COUNSEL

Defendants have admitted that counsel are not always provided to juveniles in commitment hearings, and plaintiffs invoke JCA § 3–821 and Rule 906 of the Maryland Rules of Procedure to establish such a right at all stages of juvenile commitment proceedings. Rule 906 relates to the Right to Counsel in Juvenile Causes and states, in pertinent part:

a. *In All Proceedings—Appearance of Out-of-State Attorney.*

The respondent is entitled to be represented in all proceedings under this Chapter by counsel retained by him, his parent, or appointed pursuant to the provisions of subsection b 2 and 3 of this Rule. An out-of-state attorney may enter his appearance and participate in a cause only after having been admitted in accordance with Rule 20 of the Rules Governing Admission to the Bar of Maryland (Special Admission for Out-of-State Attorneys). Once so admitted, his appear-

---

**14.** Admission No. 274, Plaintiffs' Exhibit No. 117.

**15.** Admission No. 278, Plaintiffs' Exhibit No. 117.

**16.** Admission No. 279, Plaintiffs' Exhibit No. 117.

**17.** Admission No. 281, Plaintiffs' Exhibit No. 117.

**18.** Admission No. 284, Plaintiffs' Exhibit No. 117.

**19.** *See* Part II, *supra.*

ance and participation is limited by the restrictions of that Rule.

b. *Waiver of Representation—Indigent Cases.*

2. Representation of Indigents.

(a) Unless knowingly and intelligently waived, and unless counsel is otherwise provided, an indigent party, or an indigent child whose parents are either indigent or unwilling to employ counsel, shall be entitled to be represented by the Office of the Public Defender at any stage in a waiver, adjudicatory or disposition hearing, or hearing under Rule 916 (Modification or Vacation of Order).

(b) Upon request or upon the court's own motion, the Office of the Public Defender shall appoint separate counsel to represent any indigent party other than the child if the interests of the child and those of the party appear to conflict, and if such counsel is necessary to meet the requirements of a fair hearing. (Amended Nov. 5, 1976, effective Jan. 1, 1977.)

Section 3–821 of the JCA provides that "A party is entitled to the assistance of counsel at every stage of any proceeding under this subtitle." According to plaintiffs, then, "Rule 906 . . . implements this right in specifying the state agency responsible for providing counsel and implicitly charges the juvenile judges with the obligation to assure representation of all parties in juvenile proceedings over which they preside." Plaintiffs' Pretrial Brief at 34.

Plaintiffs argue that effective assistance of counsel is required as part of due process in all criminal proceedings, *Powell v. Alabama,* 287 U.S. 45, 71, 53 S.Ct. 55, 77 L.Ed. 158 (1932); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Argersinger v. Hamlin,* 407 U.S. 25, 37, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972), and that the same right was extended to juvenile delinquency proceedings by *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), where the Supreme Court noted that a delinquency adjudication "subjected [the juvenile] to the loss of his liberty for years [and

was] comparable in seriousness to a felony prosecution." 387 U.S. at 36, 87 S.Ct. at 1448. Since counsel was necessary to help fathom the law as well as ascertain relevant facts and guarantee regularity of proceedings, *id.,* the Court held that

the Due Process Clause of the Fourteenth Amendment requires that in respect of proceedings to determine delinquency which may result in commitment to an institution in which the juvenile's freedom is curtailed, the child and his parents must be notified of the child's right to be represented by counsel retained by them, or if they are unable to afford counsel, that counsel will be appointed to represent the child.

387 U.S. at 41, 87 S.Ct. at 1451.

■ In *Briggs v. Mandel,* Civil No. 54644 (Circuit Court of Baltimore City, 2/28/75), the court established the right of appointed counsel in involuntary civil commitment hearings in Maryland. Since the circumstances of the present case involve that "massive curtailment of liberty" found in *Humphrey v. Cady,* 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972), as well as a restriction of liberty similar to that in *In re Gault, supra,* defendants have shown no reasons as to why the facts of the present case necessitate an outcome different from *Briggs, Humphrey* or *Gault.* In the present case, the reasoning of *Gault* applies *a fortiori* because the problem is not so much the inability of the child to *afford* counsel as it is the inability of the child facing civil commitment to *understand* the nature of the commitment process. Clearly this situation is one contemplated by the Supreme Court in *Argersinger* where "The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel." 407 U.S. at 31, 92 S.Ct. at 2009, *citing Powell v. Alabama,* 287 U.S. 45, 68–69, 53 S.Ct. 55, 63–64, 77 L.Ed. 158 (1932). The right to counsel is similarly warranted on equal protection grounds since counsel is already required for juvenile commitments pursuant to Article 59, §§ 11(g) and 12, and is expressly contemplated by Rule 906 and JCA § 3–821.

Today there can be "little doubt that a person detained on grounds of mental illness has a right to counsel, and to appointed counsel if the individual is indigent." *Lessard v. Schmidt*, 349 F.Supp. 1078, 1097 (E.D.Wis.1972), *vacated and remanded on other grounds,* 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974). *See also In re Barnard,* 147 U.S.App.D.C. 302, 310, 455 F.2d 1370, 1378 (D.C.Cir.1971); *Heryford v. Parker,* 296 F.2d 383 (10th Cir. 1968); *Suzuki v. Quisenberry,* 411 F.Supp. 1113 (D.Hawaii 1976); *Bell v. Wayne County General Hospital at Eloise,* 384 F.Supp. 1085 (E.D.Mich. 1974); *Lynch v. Baxley,* 386 F.Supp. 378, 389 (M.D.Ala.1974). This right was specifically recognized by Judge Harvey of this bench in the context of insanity acquittees, *Dorsey v. Solomon,* 435 F.Supp. 725, 733 (D.Md.1977), and the reasoning therein is equally applicable to the instant case. Plaintiffs have also pointed to the extensive commentary in legal periodicals supporting the right to counsel in civil commitment cases.[20] Defendants respond that there is no basis for the requested declaratory relief[21] and that such relief is unnecessary in light of the Memorandum issued on March 17, 1978 by Chief Judge Robert C. Murphy to all Maryland trial judges. That Memorandum, however, mentioned the right to counsel, and in particular the need to implement a program assuring notification of counsel, in terms which did not emphasize that counsel had to be required in all instances:

> To assure that the right to counsel in these cases is properly secured, a procedure must be established to assure that the local Public Defender (or in those counties where representation is provided

through Legal Aid, Judicare, or other agencies) is notified whenever a juvenile petition is filed if it is ascertained that the child's parents are unable or unwilling to provide counsel. Efforts to establish such a procedure with the cooperation of the Juvenile Services Administration, the Department of Social Services and the Public Defender's Office are now under way. While this procedure should protect the child's right to counsel in every case, it is incumbent upon all juvenile judges to make certain such representation is in fact made available. If, pending implementation of the procedure, or after its implementation, there is no counsel present for the child and such counsel is not waived in accordance with Rule 906 b 1, juvenile judges should make provision for counsel before beginning the proceedings. This is of particular importance in any juvenile proceeding which might result in the child's placement in a mental health facility or other placement outside of his home.

Defendants' Exhibit No. 1. Although Chief Judge Murphy speaks in advisory terms only, defendants note that "Most of plaintiffs' evidence as to failure to provide counsel deals with commitments which predated Judge Murphy's Memorandum and the institution of the new procedure." Defendants' Solomon, et al. Post-Trial Memorandum at 12.

Plaintiffs have, however, submitted evidence as to juvenile representation in Baltimore and Anne Arundel Counties indicating that even after the letter of March 17, 1978, there were two class members who were not represented by counsel in connection

---

**20.** *See generally* Andalman & Chambers, *Effective Counsel for Persons Facing Civil Commitment: A Survey, A Polemic and A Proposal,* 45 Miss.L.J. 43, 44 (1974); Litwack, *The Role of Counsel in Civil Commitment Proceedings: Emerging Problems,* 62 Cal.L.Rev. 816 (1974); Cohen, *The Function of the Attorney and the Commitment of the Mentally Ill,* 44 Tex.L.Rev. 424 (1966); *Developments in the Law—Civil Commitment of the Mentally Ill,* 87 Harv.L.Rev. 1190, 1283–91 (1974); Note, *The Right to Counsel at Civil Competency Proceedings,* 40 Temple L.Q. 381 (1967).

**21.** Defendants' contention that *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975), *reh. denied,* 421 U.S. 971, 95 S.Ct. 1969, 44 L.Ed.2d 463 (1976), would bar such declaratory relief as plaintiffs' request is considered *infra,* along with the claim that the proper avenue of relief should be through a habeas corpus proceeding.

with their placement in a mental hospital—a juvenile in Anne Arundel County who was committed to Crownsville Hospital Center [21A] (Plaintiffs' Exhibit No. 18) and one in Baltimore County who was detained at Spring Grove Hospital Center pending placement (Plaintiffs' Exhibit No. 119).

While this opinion was in the drafting stage, the Supreme Court decided *Parham v. J. L.,* 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979), in which the right to counsel in the *voluntary* civil commitment context was discussed at length by the Chief Justice. In *Parham,* the Court held that "the risk of error inherent in the parental decision to have a child institutionalized for mental health care is sufficiently great that some kind of inquiry should be made by a 'neutral factfinder' to determine whether the statutory requirements for admission are satisfied." 442 U.S. 606, 99 S.Ct. at 2506. Yet the Court went further to explain that due process requirements did not require that the neutral factfinder had to be "law-trained or a judicial or administrative officer." *Id.* Recognizing that "[t]he mode and procedure of medical diagnostic procedures is not the business of judges," *id.,* the Court determined that an adequate independent review could be performed by a "staff physician . . . so long as he or she is free to evaluate independently the child's mental and emotional condition and need for treatment." *Id.*

In holding that the reviewing mental factfinder did not have to be law-trained or a judicial or administrative officer, Chief Justice Burger explicitly premised his conclusions upon the belief that adversary confrontation between parent and child would pose the danger of "significant intrusion" into the parent-child relationship. "Pitting the parents and child as adversaries often will be at odds with the presumption that parents act in the best interests of their child." 442 U.S. at 610, 99 S.Ct. at 2508. Referring to "those pages of human experience that teach that parents generally do act in the child's best interests," the Court

concluded that "[t]he statist notion that governmental power should supersede parental authority in *all* cases because *some* parents abuse and neglect children is repugnant to American tradition." *Id.* at 603, 99 S.Ct. at 2504. Finally, counsel was not required to conduct the review since there was no reason to conclude that lawyers would be more skilled evaluators than professional physicians and psychiatrists. *Id.* at 611, 99 S.Ct. 2493.

As the Supreme Court has noted, however, "due process is *flexible* and calls for such procedural protections as the particular situation demands." 442 U.S. at 608, 99 S.Ct. at 2507, *citing Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). In the present case, a flexible due process approach mandates a different conclusion from that arrived at by the Supreme Court in the *voluntary* commitment context. The issue before this Court is the scope and character of periodic review of *involuntary* commitments. Here we have no assumed paternalism between parent and child and no possible intrusion of the adversary system into the sensitive psychology of the parent-child relationship. The "statist notion" discussed above which was described as repugnant to the American tradition in the case where governmental power sought to supersede parental power is simply irrelevant here. When it is the State which, in effect, has become the child's family, a more independent, adversary-type review of commitment is required. Requiring legal counsel in such instances does not reflect the belief that the State will abuse or neglect such children, but rather demonstrates the need to hold the State accountable whenever its actions are premised upon the "best interests" of a mentally disturbed child. As Chief Justice Burger indicated, the risks are higher when a child is alone and at the State's mercy: "For a child without natural parents, we must acknowledge the risk of being 'lost in the shuffle.'" *Parham, supra,* 442 U.S. at 619, 99 S.Ct. at 2513. Consequently, the

---

**21A.** Defendants submitted evidence that the juvenile and his mother had waived counsel in the Anne Arundel County case. Defendants' Exhibit 91.

risk of error both initially and over the long run when the state commits a child is sufficiently great to warrant mandatory periodic review by a neutral factfinder skilled in the complexity of adversary contests. Although the State may have assumed the position of surrogate father and mother, one cannot assume the same sort of care and concern to be forthcoming in the absence of the loving concern of natural parents.

The evidence in this case has revealed not so much an insensitive bureaucracy, so much as a ponderously slow one. The record is replete with instances of overlong and unnecessary involuntary commitments. Although adversarial input will never substitute for the love and affection of a child's natural parents, it may nonetheless serve to relieve some degree of suffering by helping to prevent unnecessary and overlong involuntary commitments.

■ The right to counsel for involuntarily committed juveniles is too important a guarantee to leave to the vagaries of haphazard application. Having found that such a right exists as a matter of due process and that Maryland law even contemplates such a right, it is necessary to grant injunctive relief providing that no juvenile shall hereafter be involuntarily committed to a Maryland mental hospital unless counsel has been provided. Furthermore, counsel must also be present at the time of any redetermination, such as the mandatory six-month review discussed in the preceding section. As the court in *Tucker v. City of Montgomery Board of Commissioners,* 410 F.Supp. 494, 508 n. 19 (M.D.Ala.1976), said,

Where the claim of ineffective representation stems not from the nature of representation but rather from the fact of either no representation or delayed provi-

sion of counsel while defendant suffers loss of liberty, equitable relief can be fashioned which guarantees protection of the right to counsel.

Voluntary civil commitments will, of course, be governed by the Supreme Court's ruling in *Parham, supra,* and the statutory provisions of the Annotated Code of Maryland and Rule 906.

Following the approach of the *Tucker* court, this Court directs the defendants within thirty days to file a plan with the Court outlining the means through which the right to counsel will be implemented.[22]

Defendants have raised several objections to the Court's ability to grant the relief sought by plaintiffs as to mandatory counsel. Contending that the Court is barred from acting by *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), which would require a federal court to avoid intervention in an ongoing state civil proceeding such as the commitment of juveniles, *see Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975), *reh. denied,* 421 U.S. 971, 95 S.Ct. 1969, 44 L.Ed.2d 463 (1976); *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *Lynch v. Snepp,* 472 F.2d 769 (4th Cir. 1973), *cert. denied,* 415 U.S. 983, 94 S.Ct. 1576, 39 L.Ed.2d 880 (1974), defendants maintain that there are no exceptional grounds such as bad faith or harassment which would warrant raising the lack of counsel question in any collateral federal proceeding other than through a habeas corpus petition. Defendants would therefore bring the facts of this case within the rationale of *Preiser v. Rodriguez,* 411 U.S. 475, 500, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), which dealt with a challenge to improper confinement rather than the conditions of that confinement. Consequently, section 1983 relief would be inappropriate

---

**22.** The *Tucker* court required that the plan submitted address the following matters:

Means to make known to accused persons that if they are indigent they are entitled to appointed counsel; means to determine the indigency or nonindigency of persons who desire appointed counsel; means to record for each accused person the existence and

the name of counsel of retained, the request or absence of request for appointed counsel if there is no retained counsel, the result of a determination of indigency or nonindigency for each person requesting appointed counsel, and the name of counsel where appointed.

410 F.Supp. at 507–08.

in this case, and plaintiffs must then be required to satisfy the pertinent habeas corpus exhaustion provisions of 28 U.S.C. § 2254(b) and (c). As a further and final basis for precluding the relief sought in this case from a federal court, defendants point to the inappropriateness of injunctive relief on the basis of general principles of comity. *Rizzo v. Goode,* 423 U.S. 362, 377–81, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).[23] The evidence, argue defendants, does not justify broad injunctive relief, especially in light of Chief Judge Robert C. Murphy's March 17, 1978 Memorandum to all Trial Judges in Maryland recommending that "juvenile judges *should* make provision for counsel before beginning the proceedings." Defendants' Exhibit No. 1. (Emphasis added).

Plaintiffs respond to defendants' *Younger* argument by noting the absence of any pending state court proceeding. They did not bring the present action to enjoin any ongoing Juvenile Court proceeding or as a means of proceeding in lieu of appealing a state court ruling on the claims presented herein.

Several cases cited by plaintiffs in their Reply to Defendants Solomon et al. Post-Trial Memorandum support their argument that abstention under *Younger* and *Huffman* is unwarranted in the instant case. *See, e. g., French v. Blackburn,* 428 F.Supp. 1351 (M.D.N.C.1977); *Coll v. Hyland,* 411 F.Supp. 905 (D.N.J.1976); *Goldy v. Beal,* 429 F.Supp. 640 (M.D.Pa.1976); *Kidd v. Schmidt,* 399 F.Supp. 301 (E.D.Wis.1975). In *French,* the court declined to abstain in a case challenging North Carolina's statutory involuntary commitment procedures since there was no commitment proceeding pending as to the plaintiff. 428 F.Supp. at 1354 n. 5. The court in *Coll* reached a similar conclusion by way of distinguishing *Schmidt v. Lessard,* 421 U.S. 957, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975):

Defendants also claim that abstention is proper. They contend that under the teachings of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny, this suit is not appropriate for injunctive relief because of the interference with state activities. They rely primarily on *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975), and *Schmidt v. Lessard,* 421 U.S. 957, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975). However, these cases are readily distinguishable. In *Huffman,* the federal action was filed immediately after the state trial court had entered its judgment but during the period for appeal in the state system. In *Schmidt v. Lessard, supra,* a three-judge court declared the Wisconsin civil commitment procedures constitutionally defective, but the Supreme Court vacated that judgment and remanded for further consideration in light of *Huffman v. Pursue, Ltd., supra.* Examination of the lower court opinions reveals that the federal intervention occurred immediately after the patient had been committed but before a hearing had been set in the state court. 411 F.Supp. at 908.

*Goldy,* which presented a challenge to Pennsylvania's mental health statute, also involved a claim by defendants that the federal court should abstain from deciding the merits in light of the reasoning of *Younger, supra,* and *Railroad Commission v. Pullman Company,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). In rejecting defendants' arguments, the court stated:

> The abstention issues require little comment. Defendants maintain that this Court should abstain under the *Pullman* rationale in order to afford the Pennsylvania state courts the opportunity to construe section 406 in a manner that would avoid the constitutional problems of vagueness and overbreadth. The short

---

**23.** Defendants also rely on *Kelly v. Wyman,* 294 F.Supp. 893 (S.D.N.Y.1968), *aff'd,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), for the claim that

> proceedings to compel state officials to comply with their statutory or regulatory duties

> should usually be brought in state courts, and that supervision of a state administrative program is ordinarily an inappropriate role for a three-judge federal court. . . .

294 F.Supp. at 907.

answer to this contention is that the Pennsylvania Supreme Court recently declined an opportunity to rule on the constitutionality of section 406, in *Commonwealth ex rel. Finken v. Roop,* 234 Pa.Super. 155, 339 A.2d 764 (1975), petition for allocatur denied, October 17, 1975. In *Finken,* a habeas corpus action challenging a commitment pursuant to section 406, the Pennsylvania Superior Court, in a 4–3 opinion, ordered the petitioner discharged for failure to comply with the procedural requirements of the Act itself. Three of the judges also reached the constitutional issues raised by the petitioner, and held, *inter alia,* that the commitment standards of section 406 were void for vagueness. *Id.* at 179–184, 339 A.2d 764. The Pennsylvania Supreme Court's denial of allocatur in *Finken* means that there is no prospect of a Pennsylvania Supreme Court decision regarding the constitutionality of section 406 in the near future. Because a federal court may not abstain " 'simply because the rights asserted may be adjudicated in some other forum,' " *Zwickler v. Koota,* 389 U.S. 241, 248, 88 S.Ct. 391, 395, 19 L.Ed.2d 444 (1967), citing *Stapleton v. Mitchell,* 6 F.Supp. 51, 55 (D.Kan.1945), this Court declines defendants' invitation to abstain in this case.

Defendants' *Younger v. Harris* argument is equally without merit. The *Younger v. Harris* doctrine only applies when a federal court is asked to enjoin or interrupt an on-going state court proceeding in which the federal plaintiffs will have an opportunity to have their claims adjudicated. *See Hicks v. Miranda,* 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975). There presently exists no state court proceeding whatsoever involving these plaintiffs, and no such proceeding is imminent. *Younger v. Harris,* therefore, simply does not apply to this case.

429 F.Supp. at 644–45. The court further addressed defendants' argument that under the rationale of *Preiser v. Rodriguez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), a section 1983 action was improper where habeas corpus relief under 28 U.S.C. § 2254 was the appropriate avenue:

Several cases decided since *Preiser* would appear to support plaintiffs' proposed distinction from that case. In *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), plaintiffs were pretrial detainees who were being held for trial under a prosecutor's information and who had not had any judicial determination of probable cause. They brought a section 1983 action in the district court, claiming a constitutional right to a judicial hearing on the issue of probable cause and requesting an order that the state authorities afford them a probable cause determination. The Court held that "[b]ecause release was neither asked nor ordered, the lawsuit did not come within the class of cases for which habeas corpus is the exclusive remedy." *Id.* at 107 n. 6, 95 S.Ct. at 859. *See also Gomez v. Miller,* 341 F.Supp. 323 (S.D.N.Y.1973) (3-judge court), which was decided prior to the decision in *Preiser,* but was affirmed summarily following *Preiser* in *Miller v. Gomez,* 412 U.S. 914, 93 S.Ct. 2728, 37 L.Ed.2d 141 (1973). Because plaintiffs in this case do not request release from custody, they are not required to proceed by habeas corpus. *Accord, Bradford v. Weinstein,* 519 F.2d 728, 730 (4th Cir. 1974), *vacated and remanded as moot,* 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975); and *Pope v. Chew,* 521 F.2d 400, 406 n. 8 (4th Cir. 1975).

429 F.Supp. at 645–46 (footnote omitted). This Court finds the reasoning in *Goldy* to be entirely apposite to the present case. Consequently, plaintiff class members will not be barred from pursuing their claims under 42 U.S.C. § 1983.

Finally, *Kidd* also found *Younger-Huffman* abstention inappropriate in a situation where the state children's court exercised continuing jurisdiction over the juvenile for matters concerning questions of dependency and neglect but not commitment. Since there were no pending state commitment proceedings, abstention was held to be inappropriate. 399 F.Supp. at 303. *See also Santiago v. City of Philadelphia,* 435

F.Supp. 136, 144–46 (E.D.Pa.1977); *Kamke v. Silverman,* 418 F.Supp. 1003, 1005 (E.D. Wis.1976).

Defendants reason that there is no basis for injunctive relief as to the provision of counsel on the grounds that there has been no showing of their "direct responsibility" for any constitutional violations and that there is insufficient evidence pointing to the need for an "extraordinary remedy." *Rizzo v. Goode,* 423 U.S. at 373–77, 96 S.Ct. 598. The Fourth Circuit, however, has noted that "[w]hile *Rizzo* states that the principles of federalism militate against injunctive relief under 42 U.S.C. § 1983 against the executive branch of state or local governments, *Rizzo* does not preclude recourse to broad injunctions when a clear pattern of unconstitutional conduct has been established." *Bolding v. Holshouser,* 575 F.2d 461, 466 (4th Cir. 1978), *cert. denied,* 434 U.S. 837, 99 S.Ct. 121, 58 L.Ed.2d 133 (1979). *See also Tucker v. City of Montgomery Board of Commissioners,* 410 F.Supp. 494, 509 (M.D.Ala.1976); *Cicero v. Olgiati,* 410 F.Supp. 1080, 1091 (S.D.N.Y. 1976).

As already explained, plaintiffs' evidence amply demonstrates that counsel has not been provided even after Chief Judge Murphy's letter and extending through the date of the trial. In noting that the provision of counsel as contained in the statute and court rule is often disregarded in juvenile proceedings, plaintiffs endeavor to distinguish the ruling in *Kelly v. Wyman, supra,* 294 F.Supp. 893 (S.D.N.Y.1968), *aff'd,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). In *Kelly,* welfare recipients challenged under the Civil Rights Act, 42 U.S.C. § 1983, procedures utilized in terminating their welfare benefits which ended their assistance prior to a hearing. While the three-judge court mandated that certain procedures, including a pretermination hearing, were constitutionally required, the court refused relief with regard to the allegation that the regulations were frequently disregarded. 294 F.Supp. at 907. Plaintiff class members successfully distinguish *Kelly* on two grounds. First, *Kelly* involved administrative matters only and did not codify any constitutional right which this Court has found to be applicable. Second, the regulations in *Kelly* had been recently promulgated, whereas JCA § 3–821 was first enacted in 1969 and Rule 906 of the Maryland Rules of Procedure was enacted in 1975. Accordingly, defendants' arguments that injunctive relief is not warranted are without merit, and they should comply with this Court's Order to file a plan within thirty days which will implement the right to counsel.

## V. THE RIGHT TO TREATMENT, CARE, AND HABILITATION IN THE LEAST RESTRICTIVE SETTING

More than any other aspect of plaintiffs' case, the alleged right to treatment, care, and habilitation in the least restrictive setting will require an evaluation of the technical medical issues often raised in psychiatric treatment and also a consideration of whether additional revenues should be forthcoming from the State to satisfy minimum constitutional standards. When law, medicine, therapy, and the public purse all become intertwined in a single problem, we have all of those ingredients calling for a "special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law." *Rizzo v. Goode,* 423 U.S. 362, 378, 96 S.Ct. 598, 607, 46 L.Ed.2d 561 (1976), *citing O'Shea v. Littleton,* 414 U.S. 488, 500, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). This Court takes cognizance of Judge Van Graafeiland's observation that "[a] Federal judge rearranging a State's penal or education system is like a man feeding candy to his grandchild. He derives a great deal of personal satisfaction from it and has no responsibility for the results." *McRedmond v. Wilson,* 533 F.2d 757, 766 (2d Cir. 1976) (Van Graafeiland, J., dissenting). At the same time, a federal court has an obligation to announce and apply constitutional standards as well as to monitor their implementation. To find otherwise would, in effect, be to write the Supremacy Clause out of the Constitution altogether. Although there are obvious practical limits on the

extent to which a federal court can command expenditures from the state treasury, the fact that guaranteeing a constitutional right may call for additional state funding is not a valid defense to a constitutional requirement. *Doe v. Lally,* 467 F.Supp. 1339, 1351 (D.Md.1979); *Palmigiano v. Garrahy,* 443 F.Supp. 956, 978–79 (D.R.I.1977).

## A. Sources of the Right

Plaintiffs rely on both statutory and constitutional sources to support their argument for the right to appropriate treatment, care, and habilation. As statutory authority for their view, plaintiffs direct the Court's attention to the dispositional sectional of the JCA, section 3–820, *supra,* and the general purposes section which provides for a "liberal" construction of the JCA's overall objectives:

§ 3–802. Purposes of subtitle.

(a) The purposes of this subtitle are:

(1) To provide for the care, protection, and wholesome mental and physical development of children coming within the provisions of this subtitle; and to provide for a program of treatment, training, and rehabilitation consistent with the child's best interests and the protection of the public interest;

(2) To remove from children committing delinquent acts the taint of criminality and the consequences of criminal behavior;

(3) To conserve and strengthen the child's family ties and to separate a child from his parents only when necessary for his welfare or in the interest of public safety;

(4) If necessary to remove a child from his home, to secure for him custody, care, and discipline as nearly as possible equivalent to that which should have been given by his parents.

(5) To provide judicial procedures for carrying out the provisions of this subtitle.

(b) This subtitle shall be liberally construed to effectuate these purposes. (An. Code 1957, art. 26, § 70; 1973, 1st Sp. Sess., ch. 2, § 1; 1974, ch. 691, § 8; 1975, ch. 554, §§ 1, 3.)

Section 3–820(b) likewise directs that any disposition ultimately recommended be one prescribing "a program of treatment, training, and rehabilitation best suited to the physical, mental, and moral welfare of the child consistent with the public interest." Maryland courts which have given effect to these statutes have found them to require rehabilitation of juveniles in " 'a wholesome family environment whenever possible,' " *In re Hamill,* 10 Md.App. 586, 591, 271 A.2d 762, 765 (1970), and within an environment closely resembling "the intimacy, closeness and wholesomeness of the natural family environment." *Matter of Carter and Spaulding,* 20 Md.App. 633, 653, 318 A.2d 269, 281 (1974), *aff'd,* 273 Md. 690, 332 A.2d 246 (1975).

Pointing to other states whose Juvenile Acts have language similar to section 3–802, plaintiffs cite a series of cases where federal courts have interpreted the statutory language as creating a right to care, treatment, and habilation. *See, e. g., Creek v. Stone,* 126 U.S.App.D.C. 329, 332–333, 379 F.2d 106, 109–10. (1967); *In re Elmore,* 127 U.S.App.D.C. 176, 177–179, 382 F.2d 125, 126–28 (1967); *Nelson v. Heyne,* 355 F.Supp. 451 (N.D.Ind.1973), *aff'd,* 491 F.2d 352 (7th Cir. 1974), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974).

Besides the statutory basis for the right, plaintiffs point to the presence of a constitutional basis which follows from the *parens patriae* position already discussed.[24]

**24.** Plaintiffs rely on a large collection of scholarly publications in support of this claim that there is a constitutional right to treatment. *See, e. g.,* Note, *Developments in the Law — Civil Commitment of the Mentally Ill,* 87 Harv. L.Rev. 1190, 1316–58 (1974); Comment, *Wyatt v. Stickney and the Right of Civilly Committed Mental Patients to Adequate Treatment,* 86 Harv.L.Rev. 1282 (1973); Schwitzgebel, *Right to Treatment for the Mentally Disabled: The Need for Realistic Standards and Objective Critieria,* 8 Harv.Civ.Rights—Civ.Lib.L.Rev. 513 (1973); Symposium, *The Right to Treatment,* 57 Georgetown L.J. 673 (1969); Bazelon, Implementing the Right to Treatment, 36 U.Chi.L.Rev. 742 (1969); Note, *The Rights of*

Since commitment involves a loss of liberty, any such restrictions must be justified in terms of some governmental interest. Thus, for the State to justify its actions, there must be "proper" treatment provided in the sense that such treatment must "bear some reasonable relation to the purpose for which the individual is committed." *Jackson v. Indiana*, 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972).

The groundbreaking case in this area is *Rouse v. Cameron*, 125 U.S.App.D.C. 366, 373 F.2d 451 (1966), which held that civil commitment of a criminally insane person, without treatment, would raise "serious" constitutional problems. In *Rouse*, Chief Judge Bazelon posited a relationship between commitment and treatment which, in effect, paralleled the *parens patriae* rationale:

> The purpose of involuntary hospitalization is treatment, not punishment. The provision for commitment rests upon the supposed "necessity for treatment of the mental condition which led to the acquittal by reason of insanity." [*Ragsdale v. Overholser*, 108 U.S.App.D.C. 308, 315, 281 F.2d 943, 950 (1960) (Fahy, J, concurring).] Absent treatment, the hospital is "transform[ed] * * * into a penitentiary where one could be held indefinitely for no convicted offense, and this even though the offense of which he was previously acquitted because of doubt as to his sanity might not have been one of the more serious felonies" [id.] or might have been, as it was here, a misdemeanor.

125 U.S.App.D.C. at 367–368, 373 F.2d at 452–53. Although the outcome in *Rouse* was based in part upon a Congressional statutory right to treatment found in the 1964 Hospitalization of the Mentally Ill Act, *id.*, the Court squarely recognized that "[r]egardless of the statutory authority, involuntary confinement without treatment is 'shocking'" 125 U.S.App.D.C. at 370, 373 F.2d at 455.

The right to treatment now appears as a solid tenet of constitutional law, and is recognized as establishing certain minimum standards of treatment to guard against not only neglect but also what might be termed unfulfilled paternalism. As Chief Judge Frank Johnson, Jr. recognized in *Wyatt v. Stickney*, 325 F.Supp. 781, 785 (N.D.Ala. 1971), which affirmed the right of treatment for persons in noncriminal custody:

> To deprive any citizen of his or her liberty upon the altruistic theory that the confinement is for humane therapeutic reasons and then fail to provide adequate treatment violates the very fundamentals of due process.

■ *Rouse* initiated a groundswell which, in the years immediately following, was repeatedly reinforced in both lower federal courts [25] and legal literature.[26] Some ten years ago at least one commentator claimed that the right to treatment had become a constitutional requirement stemming from substantive due process considerations:

> This short history of the right to treatment demonstrates that a new concept of substantive due process is evolving in the

---

the Mentally Ill During Incarceration : *The Developing Law*, 25 U.Fla.L.Rev. 494 (1973); Note, *The Nascent Right to Treatment*, 53 Va.L. Rev. 1134 (1967); Note, *Civil Restraint, Mental Illness, and the Right to Treatment*, 77 Yale L.J. 87 (1967); Birnbaum, *The Right to Treatment*, 46 A.B.A.J. 499 (1960); Birnbaum, *Some Remarks on "The Right to Treatment,"* 23 Ala.L. Rev. 623 (1971); Chambers, *Alternatives to Civil Commitment of the Mentally Ill* : *Practical Guides and Constitutional Imperatives*, 70 Mich.L.Rev. 1107 (1972); Drake, *Enforcing the Right to Treatment* : *Wyatt v. Stickney*, 10 Am.Crim.L.Rev. 587 (1972).

**25.** *See, e. g., Wyatt v. Aderholt*, 503 F.2d 1305 (5th Cir. 1974); *Nelson v. Heyne*, 491 F.2d 352

(7th Cir.), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974); *Welsch v. Likins*, 373 F.Supp. 487 (D.Minn.1974); *aff'd in part, vacated and remanded in part*, 550 F.2d 1122 (8th Cir. 1977); *Martarella v. Kelley*, 349 F.Supp. 575 (S.D.N.Y.1972).

**26.** *See generally*, Note, *Civil Restraint, Mental Illness and the Right to Treatment*, 77 Yale L.J. 87 (1967); Note, *The Nascent Right to Treatment*, 53 Va.L.Rev. 1134 (1967); *A Symposium* : *The Right to Treatment*, 57 Georgetown L.J. 673 (1969); Gough, *The Beyond-Control Child and the Right to Treatment* : *An Exercise in the Synthesis of Paradox*, 16 St. Louis U.L.J. 182 (1971).

therapeutic realm. This concept is founded upon a recognition of the concurrency between the state's exercise of sanctioning powers and its assumption of the duties of social responsibility. Its implication is that effective treatment must be the *quid pro quo* for society's right to exercise its *parens patriae* controls. Whether specifically recognized by statutory enactment or implicitly derived from the constitutional requirements of due process, the right to treatment exists. Kittrie, *Can the Right to Treatment Remedy the Ills of the Juvenile Process?*, 57 Georgetown L.J. 848, 870 (1969) (footnotes omitted). While the Supreme Court has not yet explicitly recognized such a right, its opinion in *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), invites such a determination, as Justice Stewart wrote that "a State cannot constitutionally confine without more a non-dangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends." 422 U.S. at 576, 95 S.Ct. at 2494. The "more" which the Supreme Court requires has only recently been interpreted as necessitating a clearer proof of mental illness and dangerousness, and this more precisely articulated standard will implement the *parens patriae* concept of the relationship between the justification for civil commitment and the need to guarantee that treatment is actually provided. *Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). In fact, at one point in *Addington*, Chief Justice Burger cited the Texas Supreme Court's holding in *State v. Turner*, 556 S.W.2d 563, 566 (1977), where the court noted that "[t]he involuntary mental patient is entitled to treatment, to periodic and recurrent review of his mental condition, and to release at such time as

he no longer presents a danger to himself and others." 441 U.S. at 428 n. 4, 99 S.Ct. at 1810 n. 4. Our society guarantees the liberty interests of all its members, and when the State acts to deprive one of his liberty interest, the claim does not flow in one direction only, that is to say, the State against the citizen. Our democratic institutions presuppose a reciprocal flow of rights and duties meaning that the individual can no more make unilateral demands against the State than the State can against the individual. The right to treatment, then, is but the corresponding obligation of the State in light of its right to exercise its *parens patriae* power over its citizens.[27] In a broader sense, it is a check and balance on the State's sovereign power to undertake civil commitments.

**B. Treatment in the Least Restrictive Setting**

Having found the existence of a constitutional right to treatment, this Court must now face the tougher, more practical problem of defining that right in terms of meaningful therapeutic standards as well as dollars and cents. The defendants, however, would have this Court stay out of the treatment standards area altogether, relying on the dictum in *Bowing v. Godwin*, 551 F.2d 44, 48 n. 3 (4th Cir. 1977):

Although courts are ill-equipped to prescribe the techniques of treatment, this does not alter the fact that in many cases treatment is obviously called for and is available in some form. In such cases, the state cannot arbitrarily refuse to provide relief. The exact contours of relief should be left to the sound discretion of experts in the field.

While federalism and comity considerations may curb the tendency of a federal court to paint its mandated remedy with a broad

---

**27.** John Stuart Mill has defined the concept of a right as follows:

I have treated the idea of a right as residing in the injured person and violated by the injury. . . . When we call anything a person's right, we mean that he has a valid claim on society to protect him in the possession of it, either by force of law, or by that of education and opinion. . . . To have a

right, then, is, I conceive, to have something which society ought to defend me in the possession of.

J. S. Mill, Utilitarianism 78–79 (1863), cited in Szasz, *The Right to Health*, 57 Georgetown L.J. 734, 746 (1969). Mill's analysis also underscores the basis for this Court's finding of the constitutional right to appointed counsel.

brush, the Court is not precluded from utilizing those expert opinions present at trial or elsewhere in specifying standards of treatment [28] or in recommending that the parties together formulate an Order satisfying criteria established by the Court.[29]

Plaintiffs and defendants disagree, however, over whether the right to appropriate treatment entails treatment in the "least restrictive *alternative* setting" or the "least restrictive *available* setting." Whereas the former standard would necessitate that the State vastly expand its range of therapeutic services from those presently provided so as to provide a continuum including all medical alternatives,[30] the latter approach would contemplate fewer changes since "availabil-

ity" presumably limits financially the range of services which must be provided.[31]

One district court has recognized the tensions inherently present whenever a federal court is asked to choose between minimum and maximum standards of compliance with a constitutional commandment:

Though the term "least restrictive setting" is more a slogan than a constitutional imperative, it does serve as a convenient way to sum up the standard applicable to all governmental restrictions on fundamental personal liberties, as set forth in *Shelton v. Tucker*, 1960, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231:

. . . (E)ven though the governmental purpose be legitimate and sub-

---

**28.** Plaintiffs note that federal courts are no longer reluctant to become directly involved in specifying the technical details of remedies. *See, e. g., Wyatt v. Stickney*, 344 F.Supp. 373 (M.D.Ala.1972), *modified*, 503 F.2d 1305 (5th Cir. 1974); *Rhem v. McGrath*, 326 F.Supp. 681 (S.D.N.Y.1971); *Jones v. Wittenberg*, 330 F.Supp. 707 (N.D.Ohio W.D.1971), *aff'd sub nom. Jones v. Metzger*, 456 F.2d 854 (6th Cir. 1972); *Inmates of Boys' Training School v. Affleck*, 346 F.Supp. 1354 (D.R.I.1972); *New York State Ass'n. for Retarded Children, Inc. v. Rockefeller*, 357 F.Supp. 752 (E.D.N.Y.1973); *Martarella v. Kelley*, 359 F.Supp. 478 (S.D.N.Y. 1973).

In *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), the Supreme Court, however, noted that there were limits on the ability of federal courts to fine tune matters which essentially belonged within the province of state governments:

We do not decide today that the Maryland regulation is wise, that it best fulfills the relevant social and economic objectives that Maryland might ideally espouse, or that a more just and humane system could not be devised. Conflicting claims of morality and intelligence are raised by opponents and proponents of almost every measure, certainly including the one before us. But the intractable economic, social, and even philosophical problems presented by public welfare assistance programs are not the business of this Court. The Constitution may impose certain procedural safeguards upon systems of welfare administration, *Goldberg v. Kelly, ante*, [397 U.S.] p. 254 [90 S.Ct. 1011, 25 L.Ed.2d 287]. But the Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients. Cf. *Steward Mach. Co. v. Davis*, 301 U.S. 548, 584–85

[57 S.Ct. 883, 81 L.Ed. 1279]; *Helvering v. Davis*, 301 U.S. 619, 644 [57 S.Ct. 904, 81 L.Ed. 1307].

397 U.S. at 487, 90 S.Ct. at 1162–63 (Stewart, J.). *See also San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 42, 93 S.Ct. 1278, 36 L.Ed.2d 16, *reh. denied*, 411 U.S. 959, 93 S.Ct. 1919, 36 L.Ed.2d 418 (1972).

While noting that distinctions between substance and procedure are often unclear, Professor Tribe has remarked that "the notion of special judicial competence in the area of procedure, as distinguished from that of substance, may derive some support from Justice Stewart's [concluding] statement . . . in *Dandridge*. . . ." 397 U.S. at 487, 90 S.Ct. 1153. L. Tribe, American Constitutional Law § 10–12, at 537 (1978).

Mindful of its duty to enforce the constitution in a manner consistent with principles of comity and federalism, the Court has approached this case principally from a procedural perspective since too detailed a foray into the unresolved clinical and treatment issues raised by this case could stifle new developments resulting from additional research and experimentation.

**29.** *See, e. g., Wyatt v. Aderholt*, 503 F.2d 1305, 1319 (5th Cir. 1974).

**30.** At trial plaintiffs argued that a continuum of alternatives was required in order to implement appropriate placements in the least restrictive settings. *See* part VC(2), *infra*.

**31.** Article 59, § 12 was revised by the 1977 Maryland General Assembly to allow involuntary commitment only ". . . if there is [no] . . . less restrictive form of intervention *available* which is consistent with the person's welfare and safety." (Emphasis added).

stantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgement must be viewed in light of less drastic means for achieving the same basic purpose.

\* \* \* \* \* \*

But the imperative that least drastic means be considered does not imply a constitutional right on the part of every individual to a personal judicial determination that the means being employed to improve his condition are the best possible or the least restrictive conceivable. What is required is that the state give thoughtful consideration to the needs of the individual, treating him constructively and in accordance with his own situation, rather than automatically placing in institutions, perhaps far from home and perhaps forever, all for whom families cannot care and all who are rejected by family or society.

Similarly, the constitutional right to some *quid pro quo* does not imply a right to the best treatment available, any more than the right to counsel means the right to the nation's foremost trial lawyer. Logic, economics, and the scarcity of human resources make it impossible to supply the finest to everyone. Nor are courts, or child rehabilitation experts, however skilled, equipped to determine infallibly what is optimum. The *quid pro quo* the state must provide is treatment based on expert advice reasonably designed to affect the purposes of state action. Thus, in *Wyatt v. Aderholt, supra,*

. (T)he plaintiffs here do not seek to *guarantee* that all patients will receive all the treatment they need or that may be appropriate to them. They seek only to ensure that conditions in the state institutions will be such that

the patients confined there will have a *chance* to receive adequate treatment.

503 F.2d at 1317 (Emphasis in original).

*Gary W. v. State of Louisiana,* 437 F.Supp. 1209, 1216–18 (E.D.La.1976). The *Gary W.* Court then phrased the relevant scope of the constitutional right to treatment as follows:

The constitutional right to treatment is a right to a program of treatment that affords the individual a reasonable chance to acquire and maintain those life skills that enable him to cope as effectively as his own capacities permit with the demands of his own person and of his environment and to raise the level of his physical, mental and social efficiency.

437 F.Supp. at 1219. Other courts have spoken in terms of a "duty on the part of State officials to explore and provide the least stringent practicable alternatives to confinement of noncriminals," *Welsch v. Likins,* 373 F.Supp. 487, 501–02 (D.Minn.1974), and the provisions of "such individual treatment as [would] give each [child] a realistic opportunity to be cured or to improve his or her mental condition." *Wyatt v. Stickney,* 325 F.Supp. 781, 784 (M.D.Ala.1972), *modified,* 503 F.2d 1305 (5th Cir. 1973). *See also Welsch v. Likins,* 373 F.Supp. at 502. *Lake v. Cameron,* 124 U.S.App.D.C. 264, 364 F.2d 657 (1966), *cert. denied,* 382 U.S. 863, 86 S.Ct. 126, 15 L.Ed.2d 100 (1967) (D.C. civil commitment law required government to consider all less restrictive treatment prior to hospitalization).

Defendants reject the notion of any due process right to treatment and argue that the due process clause only requires that state action bear a reasonable relationship to a legitimate state purpose.[32] This analysis, however, is lacking in light of the conclusions reached above that the State's *parens patriae* power entails certain obligations of the State toward the individual.

Defendants submit that plaintiff class members do receive treatment which is ade-

---

32. Defendants rely on *Lochner v. New York,* 198 U.S. 45, 58, 25 S.Ct. 539, 49 L.Ed. 937 (1905); *West Coast Hotel Co. v. Parrish,* 300 U.S. 379, 391, 57 S.Ct. 578, 81 L.Ed. 703 (1937); and *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 98 S.Ct. 2207, 2213, 57 L.Ed.2d 91 (1978).

quate to satisfy any constitutional based right. They point to trial testimony indicating that each state hospital provided academic training and schooling for patients[33] and that each patient received an individual treatment plan ("ITP") generally within five days of admission. According to Department of Health and Mental Hygiene ("DHMH") Regulation 10.04.05, ITP's must be updated every two weeks during the first two months and no more than every sixty days thereafter.[34]

While plaintiffs recognize that defendants do in fact provide some degree of treatment, they suggest that several inappropriate hospitalizations result because of inadequate and insufficient alternative placements in Maryland. In other words plaintiffs maintain that those facilities currently *available* in Maryland do not provide sufficient *alternatives* so as to ensure *appropriate* treatment of civilly committed juveniles. It is the notion of "appropriateness" as expressed in *Gary W.*, and *Welsch, supra,* which serves to guide the Court towards a flexible resolution of the tensions between the status quo available and a continuum of alternatives which may be beyond the reach of the State treasury.

### C. *Inappropriate Hospitalizations*

Several times plaintiffs have stated that this case is not a "conditions" case which seeks to challenge on constitutional grounds the physical conditions of state mental institutions. Although they have contended that the inadequate treatment provided rises to a violation of the Eighth Amendment's prohibitions against cruel and un-

usual punishment, their central goal has been to secure injunctive and declaratory relief that "there is a constitutional duty on the part of the state officials to explore and provide the least stringent practicable alternatives to confinement of Plaintiff class." Plaintiffs' Reply to Post-Trial Memorandum of Defendants Solomon, et al. at 33.

### 1. *Findings by the Juvenile Court.*

One cause of inappropriate placements, according to plaintiffs, is the failure of the Juvenile Court to make findings that commitment to state mental hospitals is the most appropriate and least restrictive placement for juveniles before ordering commitment.[35] In light of the constitutional standards expressed above making such findings would seem to be a necessary complement to an overall approach, now mandated by the Supreme Court, which requires clearer proof of mental illness and dangerousness. *Addington v. Texas, supra.* Accordingly, this Court directs that future Juvenile Court commitments must be preceded by written findings of the Juvenile Court setting out on the record its determination as to a juvenile's mental status, the extent to which he is dangerous to himself or others, the bases for these findings, and the recommended disposition. In making its recommended disposition, the Juvenile Court shall state expressly the reasons why its disposition is the most appropriate and least restrictive alternative available in order that subsequent periodic reviews will have a benchmark from which to assess a juvenile's progress with a view towards establishing whether an even less restrictive alternative should be adopted.

---

**33.** Spring Grove Hospital has the Benjamin Rush School; Crownsville Hospital Center has the Phoenix School; and Springfield Hospital Center has the Muncie School.

**34.** DHMH Regulation 10.04.05 states that the ITP is intended:

To assure that the individual rights of patients are preserved and respected; to assure that the specific individual needs of patients are identified, and met as efficiently, effectively, and economically as possible; to assure medical-legal responsibility; to assure that the treatment team includes approved and competent personnel, representative of

the several clinical disciplines; and to serve as a data base for determining and requesting necessary resources.

**35.** At trial, two experts, Dr. Jerome Miller, a psychiatric social worker, and Dr. James Gordon, a physician and psychiatrist who was also an expert in alternative mental health services, explained that after reviewing class member records and visiting the various mental hospitals, they would conclude that other less restrictive placement alternatives should have been explored.

### 2. Less Restrictive Alternative Placements.

Much of plaintiffs' evidence at trial was intended to demonstrate that many hospitalized class members could be treated in alternative placements less restrictive than a mental hospital. Defendants have, to some extent, admitted this to be the case.[36] Testimony by Dr. Milton Senn showed that some fifty percent of plaintiff class members were inappropriately hospitalized. In particular, Susan E. was admitted to facilitate an abortion, and Dorthy T. was admitted to Crownsville Hospital for evaluation after a fight with her mother. Another class member, Byron W., was admitted to Eastern Shore Hospital over the objections of the hospital staff that hospitalization was inappropriate. The evidence as a whole showed that not only did several hospital treatment teams feel that less restrictive settings were appropriate for several class members,[37] but also that lack of community alternatives in particular meant longer than necessary hospitalization.[38]

Defendants contend that for plaintiffs to prevail in their right to treatment argument and their claim that additional alternatives are needed, they must demonstrate that they receive no treatment which is "meaningfully related" to their illnesses. Post-Trial Memorandum of Defendants Batterton and Bateman, at 13. They rely particularly on the ruling in *Bettencourt v. Rhodes*, Civil No. C77–12 (N.D.Ohio, September, 1977), to the effect that "[t]he Constitution requires only that when a State voluntarily undertakes to confine mentally retarded persons, it is obligated to provide them with *reasonable medical treatment*." Pointing to the fact that Maryland ranks eleventh among the fifty states in per capita spending for mental health,[39] defendants submit that they are currently doing more than enough to meet whatever deficiencies plaintiffs may point to in the State's mental health system.[40]

During the trial, plaintiffs frequently referred to the need for the State to provide a continuum of services and options which would establish a network of mental health services at every level of risk and need. Plaintiffs' suggested continuum would provide a variety of services ranging from living at home to full hospitalization and would consist of the following placement alternatives:

(1) remaining in the natural home, or with a relative or inlaw,

(2) foster homes,

(3) group homes,

(4) residential treatment centers,

(5) private treatment centers,

(6) semi-public or public treatment centers,

(7) restrictive centers.

The trial testimony demonstrated unequivocally that to create the full range of flexible, graduated placement alternatives envisioned by the continuum substantial additional spending would be required by the State. The expenses, moreover, would not be concentrated just at the upper end or more restrictive part of the continuum where the costs for treating committed juveniles with severe disturbances frequently exceeds $40,000 per annum. Testimony also showed that more resources would be necessary to encourage the creation of additional foster homes.

---

**36.** *See* Answer to Complaint of Defendants Solomon, et al., at ¶ 41; Defendants' Answers to Plaintiffs' Second Set of Interrogatories; Plaintiffs' Exhibit No. 72 and Joint Exhibit No. 2. Cumulative evidence cited by plaintiffs as to inappropriate hospitalizations and the need for alternative settings may be found on page 28 of Plaintiffs' Post-Trial Brief.

**37.** *See* the One Day Census Reports of August 18, 1976, and March 9, 1977. Plaintiffs' Exhibit No. 16, Tables 9 and 10.

**38.** Testimony of Ethel Zelenske.

**39.** Testimony of Dr. Stanley Platman. *See also* Defendants' Exhibit No. 65.

**40.** Defendants also point to their long-range plans for various new mental health facilities. *See* note 56, *infra*.

Plaintiffs' contentions in this area present the most difficult aspects of this case for this Court to resolve. The difficulty lies not only in the request that the State be directed to spend more money on mental health but that the Court mandate fairly precise guidelines so as to implement plaintiffs' theories as to the appropriate therapeutic response. While this Court was willing to venture forth into such areas when the issue concerned the constitutionality of commitment standards, findings, and the right to treatment, to do so in this area would be to overstep not only the sensitive boundaries of federalism but also to risk the danger of codifying through law an aspect of medicine and treatment which is by no means universally accepted. One court relied on by plaintiffs has remarked that "just as 'The Fourteenth Amendment does not enact Mr. Herbert Spencer's Social Statics,' *Lochner v. N. Y.*, 1905, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (Holmes, J. dissenting), it does not codify current psychological theories concerning child development or the treatment of the mentally retarded." *Gary W. v. State of Louisiana*, 437 F.Supp. 1209, 1218–19 (E.D.La.1976).

 While this Court feels that defendants have a duty to "explore and provide the least stringent practicable alternatives" to the civil commitment of juveniles, *Welsch v. Likins*, 373 F.Supp. at 502, this duty does not require a State to create the best mental health system imaginable any more than a State must create the best corrections system imaginable. Were the situation otherwise, courts could utilize the reasoning of substantive due process to effectuate basically legislative decisions which might ultimately bankrupt the State treasury. Even one of the earliest advocates of the right to treatment has recognized that public opinion must be relied upon to prod legislators to pass sufficient appropriations. Birnbaum, *The Right to Treatment*, 46 A.B.A.J. 499, 503 (1960). What this Court can do, however, is ensure that constitutional standards wherever applicable are fully satisfied. Accordingly, this Court directs that no mentally retarded or otherwise civilly committed juvenile shall be admitted to a mental institution if services and programs available in the community can afford such person adequate care, habilitation, and treatment in a setting which is not only suitable and appropriate to his needs but also least restrictive of his liberty. This mandate comports with the basic standards of commitment and periodic review already set forth in this Opinion. The State should be encouraged to continue its current programs intended to develop a more flexible treatment continuum, and this Court applauds the efforts already taken in that direction.

### 3. Lack of Alternative Settings for Maryland Class Members.

Plaintiffs point to several instances in which the continuum of care referred to above is inadequate, especially as regards available alternatives for disturbed children older than thirteen. According to Dorothy Siegel, a counselor in the area of child placement and childrens' services, there exists a sizeable gap in placement alternatives available between the group home designed for the average child and mental hospitals. Plaintiffs also pointed to the need for additional day hospital programs, residential facilities for emotionally disturbed juveniles, adoptive homes, group homes or child care institutions, residential treatment centers, halfway houses, respite care programs, and money to support the needs of foster parents.

These claims restate, in essence, the issues just dealt with in connection with the alleged need for less restrictive alternative placements. Their resolution shall be the same as that mandated by the Court in connection with section VC(2) *supra*.

### 4. The Need to Develop or Purchase Appropriate Less Restrictive Alternatives.

At trial, plaintiffs contended that for years, defendants have known of the inappropriate hospitalization and allegedly inadequate placement and treatment facilities

available in Maryland.[41] They note that "recruitment efforts by DHR and local departments of Social Services to attract additional foster homes and adoptive homes are and have been insufficient to interest and recruit these homes for emotionally disturbed juveniles for whom this placement would be appropriate." Plaintiffs' Post-Trial Brief at 37. Finally, plaintiffs allege that the Juvenile Services Administration undertakes no direct involvement in deinstitutionalizing juveniles in mental hospitals unless the Juvenile Court specifically orders that agency to participate in after care planning.

Again, many of these concerns, as explained above, are more suitably addressed to the state legislature rather than to a federal court. Insofar as involvement of the Juvenile Services Administration in after care planning is concerned, this Court encourages the Juvenile Court to consult not only with that agency but also with the DHMH as a means of implementing the commitment and review standards mandated by this Court.

### 5. Out-of-State Placements.

In demonstrating the lack of appropriate, least restrictive placement alternatives in Maryland, plaintiffs point to defendants' growing practice of relying on out-of-state placements as a means of dealing with juveniles who cannot be properly treated in existing Maryland facilities. According to plaintiffs, in January, 1978 there were 134 juveniles placed in out-of-state facilities by the JSA. Two months later that figure had grown to 185.[42]

There is *per se* nothing wrong with out-of-state placements which are undertaken for bona fide therapeutic purposes and where the out-of-state facilities are substantially equivalent to those available in Maryland. As some of plaintiffs' experts at

trial testified, however, a juvenile may consider such placement to constitute exile, with the attendant consequence being that community reintegration becomes more difficult as ties to the family, local school system, and local job opportunities are severed. Also, there is the possibility that out-of-state placements may be utilized primarily to dump problem cases which may be too complicated for state institutions. Commenting upon out-of-state placements generally, the Maryland Commission on Juvenile Justice stated that "[a]lthough the Commission views extensive use of out-of-state purchase of care as undesirable, it recognizes that this trend will continue until adequate resources are developed in Maryland." Plaintiffs' Exhibit No. 6, at 46.

While there can be no doubt that in-state placements typically promote more successful reintegration by encouraging involvement of families and communities in the treatment process, out-of-state placements should not be condemned out of hand. Obviously, depending upon geographical location, there can exist situations where an out-of-state placement would maintain a patient in closer proximity to his family and community than an appropriate in-state placement.

This Court is concerned, however, over the possibility that out-of-state commitments may be recommended indiscriminately or without proper monitoring by Maryland's Juvenile Courts and the state agencies charged with maintaining mental health standards and facilities. Plaintiffs allege that State authorities fail to undertake proper supervision over out-of-state placements. For instance, Plaintiffs allege that Defendants lack adequate means of reassuring maintenance of the family and community ties which are important to successful reintegration of juveniles placed

**41.** As evidence of defendants' awareness of this problem, plaintiffs point to their Exhibit Nos. 20, 25, 105–07, 109, 111–12; Admissions of Fact, Paragraphs 125, 128, 152, 158, 161.

**42.** A memorandum dated May 15, 1978 from Rex Smith, Director of JSA to Gary Nyman at

the Mental Hygiene Administration acknowledged that the number of out-of-state placements had nearly doubled over the past several years. Plaintiffs' Exhibit No. 15. *See also* Admissions of Fact, Paragraphs 45 and 159.

out-of-state.[43] Plaintiffs also contend that the State fails to monitor the standards and treatment practices utilized by out-of-state facilities to ensure that the therapy provided accords with the child's actual needs.[44] State mental health authorities apparently accept outright the licensing, certification, and approval of the receiving state for the out-of-state facility.[45] The Director of the JSA has acknowledged that there is no current procedure in operation for comparing a particular receiving state's standards with those applicable in Maryland.[46] Finally, to the extent that out-of-state placements generally involve those children in need of the most intensive treatment and who have the greatest difficulty in achieving reintegration, such placements will only serve to frustrate the child's eventual treatment and cure.

Defendants minimize the relevance of the out-of-state placement issue on both legal and factual grounds. First, they contend that under the holding in *Bettencourt, supra,* there can be no deprivation of any right to treatment caused by alleged negative effects when a juvenile is placed far from his family or native community. Second, they point to substantial efforts being undertaken to reduce the number of out-of-state placements. Specifically, they point to negotiations with Edgemeade of Maryland, a residential juvenile treatment center with locations in several states, to serve children in its Maryland facility rather than in its out-of-state facilities located in Idaho, Ohio, Texas, and Virginia. Both the new Hannah Moore Center and RICA II, a residential treatment center scheduled to open in September, 1979, are expected to reduce drastically the need for out-of-state placements.

While defendants' efforts in these respects should be encouraged, they must be supplemented by procedures which assure that out-of-state facilities which are used by defendants meet the legitimate therapeutic needs of the children being committed to them.

 Consequently, to the extent that such measures have not already been taken, this Court directs the Juvenile Services Administration and Department of Human Resources to undertake a comprehensive evaluation of all out-of-state institutions utilized by Maryland agencies. Such an evaluation should set forth clearly the standards of each state, the extent to which each facility complies with them and the extent to which the facility complies with the standards of the Maryland agencies. The Juvenile Services Administration and Department of Human Resources, with the cooperation of other agencies where appropriate, should continue to monitor out-of-state facilities making their findings available to the juvenile court. These evaluations should be updated annually, and any out-of-state facility which does not substantially meet the standard of Maryland's own facilities may not be used by the State. Finally, any decision to commit a juvenile to an out-of-state institution must be in writing and must clearly state the reasons why out-of-state placement is necessary and the nature of the treatment which is expected to be provided. This information shall also be made a part of the juvenile's permanent records and should facilitate evaluation of a child's commitment status at each mandatory review period.

 Since the State is acting pursuant to its *parens patriae* power in ordering such out-of-state placements, equal protection considerations mandate that Maryland children placed out-of-state receive treatment in mental institutions which are at least comparable with those found in-state. The new procedures mandated by this Court should guarantee that minimum equal protection requirements are met whenever the

---

**43.** Admissions of Fact, Paragraphs 69, 185.

**44.** Admissions of Fact, Paragraphs 186–88.

**45.** Stipulations of Fact, Paragraph 175; Admissions of Fact, Paragraph 48.

**46.** Admissions of Fact, Paragraphs 47, 50–51. *See also* Admissions of Fact, Paragraphs 52–53; Stipulations of Fact, Paragraph 176.

State exercises its involuntary commitment power. "Differences in treatment may be justified by differences in particular cases but should be reasonably related to the varying circumstances." *Nason v. Superintendent of Bridgewater State Hospital,* 353 Mass. 604, 233 N.E.2d 908, 913 (1968).[47]

### D. The Harm from Inappropriate Placements

Both during the trial and afterwards in their post-trial memorandum, plaintiffs marshalled substantial evidence to support their allegations that inappropriate placements caused serious harm to class members. They pointed to instances where improper medication has been prescribed for some class members[48] and seclusion had been ordered for others on punitive antitherapeutic grounds which, according to the testimony, often resulted in longer than necessary hospitalization.[49]

As has already been noted, plaintiffs' expert witnesses criticized hospital practices relating to ITP's and discharge planning, as well as the general environment and physical surroundings of the various institutions. These factors, along with the harm result- ing from medication and seclusion practices, unite to stigmatize the juvenile which, along with the absence of continued family and community involvement in his overall therapy, make successful reintegration the more difficult to achieve. Inappropriate and excessive hospitalization fosters deterioration,[50] institutionalization,[51] and possible regression.[52] All of plaintiffs' allegations are intended to demonstrate the need to place children in the least restrictive placement available.

In response to plaintiffs' allegations as to the harm resulting from inappropriate placements, defendants first note that this case is not a "conditions" case. Since plaintiffs themselves have admitted as much, defendants submit that much of what plaintiffs try to prove has no bearing on this case. Moreover, defendants argue that conclusions as to medication and seclusion practices do not necessarily reflect the widespread opinions of the psychiatric profession. Seclusion, they argue, is a generally accepted therapeutic practice, and several experts have sanctioned its use as opposed to prescribing medication:

---

**47.** *See also Sinhogar v. Parry,* 98 Misc.2d 28 (Sup.Ct. N.Y. County 1979), where the court found certain out-of-state placements violative of the New York Social Services Law and held that due process requirements would attach.

**48.** Plaintiffs presented expert testimony from Doctors Senn, Gordon and Schwarz to the effect that *state mental hospitals engaged in questionable medication practices* including the following: routine administration of psychotropic and other mood-altering drugs upon admission, unnecessarily high medication dosages, inadequate medication monitoring, and unnecessary medication of plaintiff class members. Dr. Senn pointed out that such improper medication practices, especially where drugs are used not as therapy but as control devices, have adverse toxicological as well as psychological effects on the patients. Another questionable practice noted by plaintiffs' experts was polypharmacy—the use of more than one drug having like properties or effects at the same time. At least one class member was found to have been administered a highly questionable combination of drugs. The experts also noted a causal relationship between inappropriate and prolonged hospitalization and the initial and increased prescription of medication along with seclusion as control mechanisms.

**49.** Plaintiffs contended that defendants' seclusion practices, as reflected in Defendants' Exhibit Nos. 8, 9, 33, 57, 59, 60 and 64, did not accurately reflect actual practices. The Admissions of Fact showed frequent seclusion of plaintiff class members in some instances on the basis of standing orders written in advance by doctors at the institutions. Admissions of Fact ¶¶ 235–242, 244–245.

**50.** By deterioration, plaintiffs mean behavior such as frequent elopements, destructive activity, loss of motivation and erratic behavior often prompted by frequent transfers between wards.

**51.** By institutionalization is meant a process whereby patients in a hospital begin to incorporate the habits and values of the hospital culture.

**52.** In the case of Byron W., testimony showed that he had been admitted to Eastern Shore Hospital Center so many times that he began to regard it as home and felt that whenever he encountered problems in his foster home he could always return there.

Seclusion represents a safe and effective form of therapeutic intervention with an inpatient when it is used as a part of an active treatment program involving close clinical assessment and monitoring of the patient by attentive, trained, and sensitive staff. In certain types of crises it is superior in efficacy to medication and ECT and may have fewer side effects. Its effectiveness is severally compromised when it is misused in any one of a variety of ways, as this essay has outlined; yet it remains of central importance in the therapeutic armamentarium of hospital psychiatry.

Gutheil, *Observations on the Theoretical Bases for Seclusion of the Psychiatric Inpatient,* Am.J.Psychiatry 135:3, March 1978, at 328 (contained in Defendants' Exhibit No. 62). Another commentator has described seclusion as being "an effective means of providing safety and security to the patient and protection to others in his environment." Kilgalen, *The Effective Use of Seclusion,* JPN and Mental Health Services 25 (Jan.1977) (contained in Defendants' Exhibit No. 62). In short, defendants contend that plaintiffs' evidence as to seclusion practices in particular is too sketchy to show a deviation from standard medical practices.

Plaintiffs cite two cases in support of their contention that the harm resulting to class members from the improper procedures and practices discussed above constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution. In *Nelson v. Heyne,* 491 F.2d 352 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974), the appeals court affirmed the district court's injunction which forbade the use of tranquilizing drugs for primarily controlling excited behavior rather than as part of "an ongoing psychotherapeutic program." 491 F.2d at 356. Recognizing that "a judge lacking expertise in medicine should be cautious when considering what are 'minimal medical standards' in particular circumstances," the court concluded that "practices and policies in the field of medicine, among other professional fields, are within judicial competence when measured against the requirements of the Constitution." 491 F.2d at 357. The Court expressed its holding in these terms:

We hold today only that the use of disciplinary beatings and tranquilizing drugs in the circumstances shown by this record violates plaintiffs' 14th Amendment right protecting them from cruel and unusual punishment. We do not intend that penal and reform institutional physicians cannot prescribe necessary tranquilizing drugs in appropriate cases. Our concern is with actual and potential abuses under policies where juveniles are beaten with an instrument causing serious injuries, and drugs are administered to juveniles intramuscularly by staff, without trying medication short of drugs and without adequate medical guidance and prescription.

491 F.2d at 357 (footnote omitted).

Likewise, in *Pena v. New York State Division for Youth,* 419 F.Supp. 203 (S.D.N. Y.1976), the district court enjoined the defendants to follow their own regulations as to the use of isolation and other physical restraints as well as the administering of tranquilizing drugs to control children's behavior. In requiring that isolation be limited to no more than six hours, "except in the most extreme circumstances," the court further mandated hourly monitoring by a staff member. 419 F.Supp. at 210–11. With respect to the intramuscular administering of thorazine, the court indicated that it "only be allowed as part of an ongoing treatment program authorized and supervised by a physician." *Id.* at 211. When thorazine was administered, a child was to be permitted the option of taking it orally so as to reduce the likelihood of adverse physical and psychological effects, and monitoring for any negative reactions should be made within one half hour of administration. *Id.*

While the findings and orders set out in *Nelson* and *Pena,* with respect to training school facilities are not applicable in every respect to this case, the approach taken by those courts to prevent abuses in

connection with administration of drugs and use of seclusion should provide a basis for the development by Mental Hygiene Administration of suitable guidelines to be promulgated in these areas. Furthermore, all medication administered must be indicated on the child's medical record along with the prescribing physician's name, the date, dosage, frequency, and a brief statement as to the therapeutic reasons for administering the drug. Also, when a new child is admitted to a state institution, drugs must not be routinely administered except under the following circumstances: (1) emergency conditions so mandate, (2) the medical history accompanying the child indicates continued medication is therapeutically required, and (3) full and accurate records are maintained at all times. Similar records must be kept insofar as seclusion practices are concerned. In prescribing this approach, the Court intends that a juvenile's medical record at the time of any periodic review will sufficiently reflect his treatment needs, his progress, and responses to permit a reasoned assessment as to whether lesser or more restrictive alternatives are necessary in a given instance. By requiring the State to meet these standards which relate primarily to record-keeping and the clear articulation of the relationship between administered treatments and overall therapeutic goals, the Court has both preserved a degree of flexibility and discretion insofar as prescribing individual treat-

ments is concerned and also guaranteed that basic constitutional standards as set forth in the Eighth and Fourteenth Amendments and elaborated upon throughout this Opinion will be satisfied. At a minimum, when coupled with mandatory periodic review and the mandatory right to counsel, an individual child can be assured that his commitment is based upon valid therapeutic grounds, both from a theoretical and a practical perspective.

### E. The State's Present Commitments

In fashioning an appropriate remedy in this case, the Court has been reluctant to mandate that the State substantially increase its spending in the areas of mental health.[53] As indicated earlier, Maryland compares favorably with other states · in terms of the resources it devotes to its mental health institutions. The Court is satisfied that the constitutional deficiencies noted by plaintiff class members can be adequately remedied by compliance with the procedural changes required by this Opinion.

Furthermore, the Court is convinced that Maryland remains committed to an overall deinstitutionalization program. Several facts are indicative of this predisposition. Deinstitutionalization is evidenced in the gradually declining population in Maryland's mental hospitals [54] and in expanding budgets for community-based services.[55]

53. The Court in *Welsch v. Likins, supra,* also noted that federalism considerations cautioned against needless confrontations between federal courts and the states over matters relating to local revenues:

under our federal system of government the federal courts should be most reluctant to interfere in local governmental affairs and should do so only where the case is clear and the need for federal interference urgent.

That consideration is perhaps more important here than it was in *Rizzo,* which involved the internal administration of the police department of the City of Philadelphia. In this case we are dealing with the right of a sovereign state to manage and control its own financial affairs. No right of a state is entitled to greater respect by the federal courts than the state's right to determine how revenues should be raised and for what purposes public funds should be expended.

. Conflicts between federal judicial power and state and local governments have arisen in the past and will doubtless arise again. But needless direct confrontations between a federal court and a state should be avoided, particularly in a field as delicate as the one here involved.

550 F.2d at 1131–32. *See also Nat. League of Cities v. Usery* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976); *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).

54. Dr. Stanley Platman testified that in 1960 some 9,000 people were in Maryland's mental hospitals. Today there are some 3,850.

55. In 1965, the MHA spent some $200,000 on community services. Today, according to Dr. Platman, that figure is $14,000,000. In 1974, the JSA spent $300,000 on purchasing care outside mental hospitals. Dr. Rex Smith testi-

New facilities are under construction and some of these, although licensed as hospitals, have a definite community orientation.[56] Also, even though the State might increase its spending on mental health care, this would not affect the fact the deinstitutionalization is often severely hampered by community and neighborhood resistance to community-based treatment centers and halfway houses.[57] Other factors to be considered include the shortage of families willing to accept and deal with emotionally disturbed children as well as the nationwide shortage of board certified child psychiatrists qualified to work with plaintiff class members.[58]

In light of the State's present substantial financial commitments and the presence of nonfinancial obstacles to deinstitutionalization, this Court remains satisfied that plaintiffs' alleged constitutional deficiencies are best dealt with by following the procedural changes required by this Opinion.

## VI. PLAINTIFF'S CLAIM UNDER SECTION 504 OF THE REHABILITATION ACT OF 1973, 29 U.S.C. § 794

Just prior to the trial, plaintiffs moved to amend their complaint in order to state a claim under section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 and its various implementing regulations. Section 504 provides that:

> No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely

by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments in this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978. Copies of any proposed regulation shall be submitted to appropriate authorizing committees of the Congress, and such regulation may take effect no earlier than the thirtieth day after the date on which such regulation is so submitted to such committees.

A "handicapped individual" is defined in the Act as:

> . . . any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such impairment, or (iii) is regarded as having such an impairment.

29 U.S.C. § 706(7)(A). *See also* 45 C.F.R. § 84.3(j) (1977). In attempting to amend their complaint to state the section 504 claim, plaintiffs seek to present what they describe in their Pre-Trial Brief as a "parallel [claim] to those claims already asserted under the Federal Constitution and the Maryland Juvenile Causes Act regarding

---

fied that in 1978 the amount spent was $600,-000. Dr. Alp Karahasan stated that the Fiscal Year 1981 budget request included for the first time money to purchase care in less restrictive settings. The amount sought was $250,000. The JSA now has 48 group homes where in 1967 it had none. The State has also sought assistance from Medicaid and other federally funded assistance programs. *See* Testimony of Dr. Karahasan and Defendants' Exhibit Nos. 45 and 45(a).

**56.** Some of the new or proposed facilities include the following: the Carter Center in Baltimore (20 adolescent beds, 4 day treatment satellites in the community); the Finan Center in Western Maryland (will have 20 inpatient, 30 outpatient places for adolescents); a planned adolescent unit in Chestertown on the Eastern Shore; Cheltenham (40 residential, 40 day

treatment places for children aged five through eighteen); RICA II (residential treatment center to open in September 1979 with 80 residential treatment places and additional day treatment places). A day treatment satellite of RICA II is already open in Frederick. MHA also plans to build one group home per year during the next five years on the grounds of existing hospitals. Funds have already been appropriated for these new group homes. *See* Defendants' Exhibit No. 43 at V–554.

**57.** Testimony of Dr. Platman. See Defendants' Exhibit No. 44 at V–519–20.

**58.** Dr. Platman testified that only 2,000 of the 27,000 board certified psychiatrists nationwide are certified in Child Psychiatry.

their right to appropriate treatment in the least restrictive alternative." Plaintiffs' Pre-Trial Brief at 76. At the pre-trial conference the Court decided to reserve on whether to allow the amended complaint.

■ While the Court has no doubt that plaintiffs satisfy all of the requirements [59] to bring suit under section 504,[60] allowing such amendment when brought on the eve of trial would add an extra discovery burden to the defendants who, together with the plaintiffs, have already generated thousands upon thousands of pages of documentation. While courts typically have shown a "strong liberality" in allowing amendments under F.R.Civ.P. 15(a), 3 Moore's Federal Practice ¶ 15.08, the rule permits the allowance to remain within the district court's discretion. *Id.* at ¶ 15.08[4]. Moore notes that the "clearest cases for leave to amend are correction of an insufficient claim of defense and amplification of previously alleged claims or defenses." *Id.* at ¶ 15.08[3].

Plaintiffs have referred to their section 504 claim as essentially "parallel" to the claims they have raised since the inception of this litigation in 1976. The federal regulations implementing section 504 were issued on May 4, 1977 and clearly have been known to plaintiffs far in advance of the trial date. *See* 45 C.F.R. §§ 84.1 *et seq.*; 42 Fed.Reg. 22676 (1977). Bringing these claims by amending the original complaint just prior to the case going to trial would have had the effect of generating more paperwork and legal argument which would have had no significant effect on the remedy

already fashioned by this Court. Plaintiffs' section 504 arguments point towards a requirement that State mental health facilities or programs receiving federal funding must seek to "mainstream" juveniles as quickly as possible. Mainstreaming in this case would include the avoidance of unnecessary or overlong hospitalization and the guaranteeing of appropriate placements in the least restrictive environment. Plaintiffs contend that they are being discriminated against in being denied access to community services and treatment.[61]

■ Denying plaintiffs' motion to amend will in no way prevent the controversy presented here from being decided on its full merits. *United States v. E. B. Hougham,* 364 U.S. 310, 317, 81 S.Ct. 13, 5 L.Ed.2d 8 (1960). While "great liberality in the allowance of amendments is desired where it is necessary to bring about a furtherance of justice," *Hirshhorn v. Mine Safety Appliances Co.,* 101 F.Supp. 549, 552 (W.D.Pa.1951), *aff'd,* 193 F.2d 489 (3d Cir. 1952), *cert. denied,* 346 U.S. 866, 74 S.Ct. 105, 98 L.Ed. 376 (1953), such liberality is unnecessary in the present case where the merits have been fully presented to this Court.

Accordingly, it is this 21st day of January, 1980, by the United States District Court for the District of Maryland,

ORDERED:

1. That the present commitment standards in the Juvenile Causes Act, Article 59,

---

**59.** To prevail under section 504, a claimant must show that he was a "handicapped person" within the terms of the Act, that he was discriminated against solely because of his handicap, and that the program or activity discriminating against him receives federal financial assistance. *See, e. g., Halderman v. Pennhurst State School & Hospital,* 446 F.Supp. 1295 (E.D.Pa.1977).

**60.** *See, e. g., Campbell v. Kruse,* 434 U.S. 808, 98 S.Ct. 38, 54 L.Ed.2d 65, *memorandum opinion vacating and remanding* 431 F.Supp. 180 (E.D.Va.1977); *Davis v. Southeastern Community College,* 574 F.2d 1158 (4th Cir. 1978).

**61.** *See, e. g., Lloyd v. Regional Transp. Authority,* 548 F.2d 1277 (7th Cir. 1977); *Halderman v. Pennhurst State School & Hospital,* 446

F.Supp. 1295, 1323–24 (E.D.Pa.1977); *Barnes v. Converse College,* 436 F.Supp. 635 (D.S.C. 1977); *Gurmankin v. Constanzo,* 411 F.Supp. 982 (E.D.Pa.1976), *aff'd,* 556 F.2d 184 (3d Cir. 1977).

The *Pennhurst* case found that confinement and isolation of the mentally retarded in geographically remote facilities was "separate and *not* equal," 446 F.Supp. at 1322, and that under § 504, unnecessarily separate and minimally adequate services are discriminatory and unlawful. The court found that plaintiffs had a statutory right to habilitation under § 504 and that their segregation resulted in the provision of separate services which were inadequate and unbeneficial.

§ 11(g) of the Maryland Annotated Code, are hereby declared to be unconstitutional for the reasons set forth herein, and the State shall adopt standards satisfying constitutional prerequisites;

2. That the absence of a mandatory review of juveniles committed to mental institutions by juvenile courts is unconstitutional, and the State shall adopt a review process satisfying constitutional prerequisites;

3. That the attached plan (Appendix A), when implemented, will cure the constitutional problems noted by this Court herein;

4. That this Court will retain jurisdiction over this matter until the attached plan is implemented fully by the Defendants;

5. That the Defendants will take such steps as necessary to assume the prompt adoption of the proposed plans (Appendices A, B, C, D, & E).

6. That the Defendants shall file a report with the Court, copies to counsel for Plaintiffs within thirty (30) days from this date and every thirty (30) days thereafter until the case is concluded, indicating (a) the progress that has occurred in implementing the attached plans, and (b) the date by which full compliance will be achieved;

7. That Plaintiffs' motion to amend their complaint to state a claim under 29 U.S.C. § 794 be, and the same is, hereby DENIED; and

8. That the Plaintiffs shall be entitled to receive reasonable compensation for court costs and attorneys' fees.

## APPENDIX A

### PLAN FOR COMPLIANCE WITH THE COURT'S OPINION IN JOHNSON v. SOLOMON

1. A juvenile may be committed by a juvenile court to the Department of Health and Mental Hygiene for placement in a State mental hospital only if the court finds that:

(a) there is no less restrictive form of intervention available which is consistent with the juvenile's condition, welfare and safety; and

(b) the juvenile:

(i) has a mental disorder;

(ii) for the protection of himself or others, needs inpatient medical care or treatment; and

(iii) is unable or unwilling to be voluntarily admitted to such facility.

2. Each juvenile who is committed by a juvenile court to the Department of Health and Mental Hygiene for placement in a State mental hospital shall have his case reviewed at least every six months to ensure that continued commitment is based upon the standard set forth in paragraph 1. For purposes of this review, the juvenile court at the time of original commitment shall order the juvenile's custodian to file with the court every six months a progress report. The custodian shall include in such report his judgment as to whether or not the juvenile continues to meet the standard for commitment set forth in paragraph 1. A copy of each report shall go to the juvenile's attorney of record. Upon the petition of the juvenile's attorney, or upon the Court's own motion the court shall grant a hearing for the purpose of hearing testimony pertinent to its review six (6) months after the juvenile's initial commitment and at six month intervals thereafter. At any such hearing the court shall apply the standard for commitment set forth in paragraph 1 when determining whether placement in the mental hospital should continue.

3. The plan to provide counsel to members of the class in *Johnson v. Solomon*, is attached hereto and marked Appendix C.

4. When a juvenile is committed by a juvenile court to the Department of Health and Mental Hygiene for placement in a State mental hospital that juvenile has a right to treatment. Every juvenile so committed shall receive treatment in accordance with the following criteria:

a. The treatment shall be based upon a professional evaluation of the patient;

b. The treatment shall be designed to meet the patient's individual condition;

c. The treatment shall be designed to reduce the necessity of continuing hospitalization by affording the patient a realistic opportunity to be cured or to improve his mental condition.

5. Before the Department of Human Resources or the Department of Health and Mental Hygiene recommends to a juvenile court that a juvenile be placed in a State mental hospital, it shall determine whether there are any less restrictive, practicable alternatives to such commitment which meet the juvenile's needs and shall provide the court with its findings in this regard. These Departments shall provide to the juvenile the least restrictive available program of treatment and care which meets the needs of the juvenile.

6. Before any juvenile court commits any juvenile to the Department of Health and Mental Hygiene for placement in a State mental hospital, it shall:

a. Order that the juvenile be evaluated pursuant to Cts. & Jud.Proc. Art. §§ 3–318 and 3–815;

b. Order that, if it is feasible and appropriate considering the juvenile's condition, this evaluation be conducted on an outpatient basis;

c. Order, where an inpatient evaluation is necessary, the admission of the child to a mental health facility for a period not to exceed 30 days for the purpose of conducting the evaluation;

d. Order that the evaluating agency report its findings and recommendations, including, at least, findings and recommendations relevant to the matters set forth below in subparagraphs d(i–v) to the Court;

e. Prepare written findings setting forth on the record its determination as to the following:

(i) The juvenile's mental status;

(ii) The extent to which the juvenile meets the standard for commitment set forth in paragraph 1;

(iii) The bases for these findings;

(iv) The recommended disposition; and

(v) The reasons why the recommended disposition is the most appropriate and least restrictive alternative available.

7. In general, the Department of Health and Mental Hygiene shall continue to explore less restrictive alternatives to institutionalization.

8. No juvenile shall be committed by a juvenile court to the Department of Health and Mental Hygiene for placement in a State mental hospital if services and programs available in the community are a practicable alternative to hospitalization and can afford, without threatening the safety and welfare of the juvenile or others, such juvenile adequate care and treatment in a setting which is suitable and appropriate to his needs.

9. Department of Health and Mental Hygiene and Department of Human Resources, jointly individually, or in cooperation with other agencies, shall evaluate annually all out-of-state child care facilities in which the Department of Human Resources and the Juvenile Services Administration place juveniles. Each such out-of-state facility shall comply with the license requirements of its own state, and comply substantially with the standards for licensing such facilities in Maryland. Any out-of-state facility which does not meet the licensing standards of its own state, or which does not comply substantially with the Maryland licensing standards shall not be used for the placement of juveniles by the Department of Health and Mental Hygiene, the Department of Human Resources, or the Juvenile Services Administration.

10. Whenever a juvenile who has been committed by a juvenile court to the custody of the Department of Human Resources or the Department of Health and Mental Hygiene is placed by such agency in an out-of-state facility, the agency shall file with the juvenile court a written statement giving the reasons for the placement, the nature of the care to be provided, and the reasons why care can not be provided in the

State of Maryland. The statement shall be placed in the juvenile's court case file.

11. All restraint, seclusion and medication of juveniles committed by the juvenile court to State mental hospitals shall be in accordance with hospital seclusion, restraint and medication procedures and with applicable standards of the Joint Commission on Accreditation of Hospitals. The Mental Hygiene Administration has also developed and will promulgate within 30 days additional seclusion and medication guidelines which will help to insure the proper use of seclusion and restraint within the State mental hospitals. These guidelines are attached to this order and marked Appendix B.

### APPENDIX B

*Seclusion Procedures for Juveniles.*

The procedure set out below will apply to all juveniles placed in seclusion in your hospital, in addition to the seclusion and restraint procedures already in effect.

1) In addition to the monitoring every 15 minutes which is presently required for each juvenile in seclusion, there is to be staff interaction with each person in seclusion at least once in each hour. The nature of the interaction should be for the purpose of determining whether continued seclusion is necessary, and whether the juvenile has any special needs which should be considered by staff.

The additional procedure is to be circulated at this time to all care personnel together with all seclusion and restraint procedures already in effect in your hospital.

2) No juvenile shall be secluded more than six hours unless there has been a determination that the juvenile would present a serious danger to himself or others if released from seclusion, the reasons for that determination have been set out in the patient's record, and the decision has been approved by the charge nurse whose approval of the continued seclusion is noted in the record. Records shall be kept indicating the names of all children held in seclusion, the reasons for seclusion, the length of seclusion, and the contacts between the secluded child and others during the period of seclusion.

*Medication Guidelines.*

While the following medication guidelines duplicate to some extent the procedures already in effect in your hospital, we ask that you circulate them in this form at this time, together with your hospital's medication procedures, to convey the concern of this administration that use of medications be limited to the greatest extent consistent with patient needs and that clear records be maintained which will give adequate treatment guidance to all concerned.

1. Major tranquilizing drugs may be used only as part of an ongoing psychotherapeutic program to treat psychotic patients authorized and supervised by a physician. Such drugs may not be used as punishment or to control patients for the convenience of staff.

2. Intramuscular administration of drugs may be administered on the basis of a p.r.n. or direct physician's order only under the following conditions:

a) Administration will be by a physician or a licensed nurse.

b) Intramuscular injections rather than oral medication will be used only if necessitated by the patient's medical needs and if such needs have been set out in the physician's order and treatment record. Unless there is a sound medical reason for not doing so, which is recorded, a patient shall be given the option of taking drugs orally.

c) The patient will be monitored for any negative reactions within one-half hour of administration.

3. Medications will not be administered routinely to persons admitted to state mental hospitals. Such drugs shall be administered only after, and on the basis of an evaluation by a physician in the admitting hospital has been

completed, except that medications may be administered upon physician's order prior to completion of the full evaluation where:

a) emergency conditions so mandate, or

b) the medical history accompanying the child indicates that continued medication is therapeutically required.

Such administration and the reasons therefor shall be fully documented in the patient's records.

4. All medications administered in State mental hospitals will be indicated on the patient's medical record together with the prescribing physician's name, the date, dosage, frequency, and a brief statement as to the therapeutic reason for administering the drug.

## APPENDIX C

## PLAN FOR PROVIDING COUNSEL TO PLAINTIFF CLASS MEMBERS IN JOHNSON V. SOLOMON

### I. PRECOMMITMENT REPRESENTATION

1. The Public Defender for the State of Maryland will distribute Juvenile Services Administration policy and procedure letter dated November 16, 1978, to all District Public Defenders, Assistant Public Defenders, Assigned Public Defenders, and contract attorneys, representing juveniles eligible for the Public Defender's services in the juvenile courts pursuant to Rule 906 of the Maryland Rules of Procedure throughout the state and will advise them of this plan.

2. Each District Public Defender in the state will designate a local attorney to whom the Juvenile Services Administration or the local Department of Social Services will send all juvenile petitions or otherwise contact when the Juvenile Services Administration or the local Department of Social Services official has reason to believe that the issue of possible commitment to a mental health facility for inpatient placement may arise. A copy of the list of designated attorneys will be sent to the Juvenile Services Administration and the Department of Social Services for distribution to intake office.

3. A local attorney designated by the District Public Defender in each district will represent all eligible juveniles in all precommitment hearings in which the issue of potential commitment to a mental health facility for inpatient placement is involved or will assign the case to a local attorney familiar with cases of this kind.

4. The chief attorney of the Involuntary Institutionalization Services Division of the Office of the Public Defender will designate an attorney as Juvenile Institutionalization Coordinator who will provide consultation, technical assistance and otherwise aid the designated local attorneys in the preparation for potential precommitment hearings.

### II. POSTCOMMITMENT PLAN

5. The attorney designated by the chief attorney of the Involuntary Institutionalization Services Division as Juvenile Institutionalization Coordinator, will represent every eligible juvenile committed to a mental health facility for placement in any postcommitment proceeding including but not limited to any required review procedures and petitions pursuant to Rules 915 and 916 of the Maryland Rules of Procedure.

6. The local attorney representing the juvenile in any precommitment hearing will notify the Juvenile Institutionalization Coordinator upon the juvenile's commitment to the Department of Health and Mental Hygiene for inpatient placement.

7. The Secretary of the Department of Health and Mental Hygiene or his designee will notify the Juvenile Institutionalization Coordinator.

A. When a juvenile has been committed by the juvenile court to the Department of Health and Mental Hygiene for inpatient placement.

B. When six months have elapsed from the date of his initial commitment to the Department of Health and Mental Hygiene for inpatient placement, and at each 6 month interval thereafter.

8. When a juvenile requests that he be released from custody and asks that steps be taken to effect his release, the appropriate hospital staff member will tell him how to contact the Juvenile Institutionalization Coordinator and will provide him with the opportunity to make that contact by telephone or mail if he so desires.

9. The Department of Health and Mental Hygiene shall forward to the Juvenile Institutionalization Coordinator all reports sent to the juvenile court regarding any juvenile committed to the Department of Health and Mental Hygiene for inpatient placement in a mental health facility.

10. The Juvenile Institutionalization Coordinator will utilize to the extent necessary the resources of the Involuntary Institutionalization Services Division including attorneys, investigators and other persons located in the regional hospitals throughout the State of Maryland.

11. The Juvenile Institutionalization Coordinator will develop a special expertise in the area of juvenile mental health law and to the extent possible, will attract qualified psychiatrists, psychologists and other experts to aid in the independent evaluation of these clients and to provide expert testimony at precommitment and postcommitment proceedings.

12. Absent special circumstances, the Juvenile Institutionalization Coordinator will exercise, on behalf of the committed juvenile, the right to have a postcommitment hearing six (6) months after commitment and every six (6) months thereafter.

## APPENDIX D

### PROPOSED AMENDMENTS TO JUVENILE COURT RULES

1. Rule 905a.1. Order for Examination.

Any order for a physical or mental examination pursuant to Section 3–818 of the Courts Article shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made. THE COURT SHALL ORDER THAT ANY SUCH EXAMINATION BE CONDUCTED ON AN OUTPATIENT BASIS IF, CONSIDERING THE JUVENILE'S CONDITION, THAT IS FEASIBLE AND APPROPRIATE. The order may regulate the filing of a report of findings and conclusions and the testimony at a hearing by the examining physician, psychiatrist, psychologist or other professionally qualified person, the payment of the expense of the examination and any other relevant matters.

2. Rule 915b.

Add at the end: THE COURT MAY NOT COMMIT A CHILD TO THE DEPARTMENT OF HEALTH AND MENTAL HYGIENE FOR INPATIENT CARE AT A STATE MENTAL HOSPITAL EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF RULE 915A.

3. Rule 915A. Placement in a facility licensed by the Department of Health and Mental Hygiene.

a. Standard for Commitment.

A court may not commit a child to the Department of Health and Mental Hygiene for placement in a facility licensed by the Department of Health and Mental Hygiene unless the court finds that there is no less restrictive form of intervention available which is consistent with the child's condition, welfare and safety and that the child:

i. Has a mental disorder;

ii. For the protection of himself or others, needs inpatient medical care or treatment; and

iii. Is unable to unwilling to be voluntarily admitted. to such facility.

b. Evaluation.

1. Order

If the court has reason to believe that a child should be committed for inpatient care at a State mental hospital it shall, pursuant to Courts Article, Section 3–818 and Rule 905, order that the child be evaluated. The evaluation shall be conducted on an outpatient basis if, .considering the child's condition, that is feasible and appropriate. Where an inpatient evaluation is necessary, the court may authorize the admission of the child to a mental health facility for a

period not to exceed 30 days for the purpose of conducting the evaluation.

2. Report

The court shall order the agency conducting the evaluation to submit a written report including its recommended disposition and its findings with respect to the following factors:

i. The child's mental status;

ii. The extent to which the juvenile meets the standard for commitment set forth in section a. of this Rule.

iii. The bases for these findings, including the reasons why the recommended disposition is the most appropriate and least restrictive disposition available.

c. Upon consideration of the report of the evaluation and upon a finding by the court that the standard for commitment set forth in section a. of this rule has been met, the court may commit the child to the Department of Health and Mental Hygiene for placement in a State mental hospital. Any such commitment shall be supported by the court's written findings setting forth its determination as to the matters set forth above in paragraph c.2.(i)–(iii) of this Rule.

d. Periodic Review of Commitment.

A commitment order issued under section c. of this Rule shall require the Department to file progress reports with the court at six month intervals during the life of the order. The report shall include the Department's judgment as to whether or not the child continues to meet the standard set forth in section a. of this Rule. A copy of each report shall be given to the child's attorney of record. The court shall review each report promptly and consider whether the commitment order should be modified. Upon the petition of the child's attorney or upon its own motion the court may grant a hearing for the purpose of hearing testimony pertinent to its review, provided that a request for such a hearing by the child's attorney must be granted after the first six months of the commitment and at six month intervals thereafter. Hearings may be granted at more frequent intervals at the court's discretion.

4. Rule 916c.

If the relief sought under section a. of this Rule is for revocation of probation and for the commitment of a respondent, OR THE MODIFICATION OF A COURT'S ORDER COMMITTING A CHILD FOR PLACEMENT IN A STATE MENTAL HOSPITAL AND PETITIONER REQUESTS A HEARING TO WHICH HE HAS A RIGHT UNDER RULE 915A.d., the court shall pass an order to show cause why the relief should not be granted and setting a date and time for a hearing. The clerk shall cause a copy of the petition and Show Cause Order to be served upon the parties. In all other cases, the court may grant or deny the relief, in whole or in part, without a hearing.

## APPENDIX E

PROPOSED DEPARTMENT POLICIES

TO IMPLEMENT THE STATE'S

PLAN IN JOHNSON v. SOLOMON

1. It is and shall be the policy and practice of each Mental Hygiene Administration facility to provide appropriate treatment for all patients at the facility. The Mental Hygiene Administration recognizes the patient's right to treatment and, therefore, such treatment shall be provided in accordance with the following criteria:

a. The treatment shall be based upon a professional evaluation of the patient;

b. The treatment shall be designed to meet the patient's individual condition;

c. The treatment shall be designed to reduce the necessity of continuing hospitalization by affording the patient a realistic opportunity to be cured or improve his mental condition.

2. It is and shall be the policy and practice of each Mental Hygiene Administration facility and provider of services to provide to each patient the least restrictive availa-

ble program of treatment and care which meets the needs of the patient. The Administration will continue to explore less restrictive alternatives to institutionalization.

3. Patient Seclusion Procedures

It is and shall be the policy and practice of each Mental Hygiene Administration facility to comply with the seclusion procedures set forth below, which are in addition to the seclusion and restraint procedures currently prescribed by the facility. If there are any conflicts or inconsistencies between the procedures below and the facility's existing seclusion procedures, the procedures below shall take precedence.

 a. Each patient shall be monitored every 15 minutes while in seclusion.

 b. At least once each hour there shall be staff interaction with the patient for the purpose of determining whether continued seclusion is necessary, and whether any special needs of the patient should be considered.

 c. No person shall be secluded more than 6 hours unless there has been a determination that the patient would present a serious danger to himself or others if released from seclusion, the reasons for that determination have been set out in the patient's record, and the decision has been approved by the charge nurse whose approval of the continued seclusion is noted in the record.

 d. Records shall be kept in a central record indicating the names of all patients held in seclusion, the reason for seclusion, the length of seclusion, and the contacts between the secluded patient and others during the period of seclusion.

4. It is and shall be the policy and practice of each Mental Hygiene Administration facility to comply with the medication procedures set forth below, which are in addition to the medication procedures currently prescribed by the facility. If there are any conflicts or inconsistencies between the procedures below and the facility's existing medication procedures, the procedures below shall take precedence.

 a. All psychotropic medications shall be used only as part of an ongoing treatment program as authorized and supervised by a physician. Major tranquilizers at antipsychotic daily dosage levels, may be used only to treat prepsychotic and psychotic patients. Such medication may not be used as punishment or to control patients for the convenience of staff.

 b. Intramuscular administration of drugs may be administered on the basis of a p.r.n. or direct physician's order only under the following conditions:

 1) Administration will be by a physician or a licensed nurse.

 2) Intramuscular injections rather than oral medication will be used only if necessitated by the patient's medical needs and if such needs have been set out in the physician's order and treatment record. Unless there is a sound medical reason for not doing so, which is recorded, a patient shall be given the option of taking drugs orally.

 3) The patient will be monitored for any negative reactions within one-half hour of administration.

 c. Medications will not be administered routinely to persons admitted to State mental hospitals. Such drugs shall be administered only after, and on the basis of an evaluation by a physician in the admitting hospital has been completed, except that medications may be administered upon physician's order prior to completion of the full evaluation where:

 1) emergency conditions so mandate, or

 2) the medical history accompanying the child indicates that continued medication is therapeutically required. Such administration and the reasons therefor shall be fully documented in the patient's records.

 d. All medications administered in State mental hospitals will be indicated on the patient's medical record together

with the prescribing physician's name, the date, dosage, frequency, and a brief statement as to the therapeutic reason for administering the drug.